[4830-01-u]
DEPARTMENT OF THE TREASURY
Internal Revenue Service
26 CFR Part 301
[Reg-251502-96]
RIN 1545-AU68
Civil Cause of Action for Certain Unauthorized Collection Actions
AGENCY: Internal Revenue Service (IRS), Treasury.
ACTION: Notice of proposed rulemaking.

SUMMARY: This document contains proposed regulations relating to civil causes of action for damages caused by unlawful collection actions of officers and employees of the Internal Revenue Service (IRS). The proposed regulations reflect amendments made by the Taxpayer Bill of Rights 2. The proposed regulations affect all taxpayers who file civil actions for damages caused by unlawful collection actions of officers or employees of the IRS.

DATES: Written comments and requests for a public hearing must be received by March 31, 1998.

ADDRESSES: Send submissions to: CC:DOM:CORP:R (Reg-251502-96), room 5226, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered between the hours of 8 a.m. and 5 p.m. to: CC:DOM:CORP:R (Reg-251502-96), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue NW., Washington DC. Alternatively, taxpayers may submit comments electronically via the Internet by selecting the "Tax Regs" option on the IRS Home Page, or by submitting

comments directly to the IRS Internet site at http://www.irs.ustreas.gov/prod/tax_regs/comments.html.

FOR FURTHER INFORMATION CONTACT: Kevin B. Connelly, (202) 622-3640 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

Background

This document contains proposed amendments to the Procedure and Administration Regulations (26 CFR part 301) relating to civil actions for damages caused by unlawful collection actions of officers or employees of the IRS. The Taxpayer Bill of Rights 2 (TBOR2), Public Law 104-168, 110 Stat. 1465 (1996), amended section 7433 of the Internal Revenue Code of 1986 (Code) by raising the cap on the amount a taxpayer may be awarded for damages caused by unlawful collection actions from $100,000 to $1,000,000. Under prior law, a suit for damages could not be brought unless the taxpayer first exhausted administrative remedies available within the IRS. TBOR2 eliminated this jurisdictional prerequisite but authorized federal district courts to reduce damage awards if the taxpayer fails to exhaust administrative remedies. The proposed regulations reflect these changes.

Explanation of Provision

Section 801 of TBOR2 amended section 7433(a) of the Code by increasing from $100,000 to $1,000,000 the cap on the amount of damages that a taxpayer may recover in Federal district court from the United States for damages caused by any unauthorized collection actions of an officer or employee of the IRS occurring after July 30, 1996. Section 802 of TBOR2 amended section 7433(d)(1) of the Code by providing that a taxpayer's failure to exhaust administrative remedies available within the IRS shall only be a factor that the court may consider in determining whether to reduce the amount of an award. In actions filed prior to the enactment of TBOR2, the failure to exhaust administrative remedies was a jurisdictional bar to an action. The proposed regulations reflect the changes made by TBOR 2.

The regulations that are being amended by these proposed regulations currently provide that administrative remedies shall be considered exhausted on the earlier of: (1) the date the decision is rendered by the IRS on an administrative claim for damages filed in accordance with the manner and form set forth in the regulations; or (2) the date six months after the date an administrative claim is filed in accordance with the manner and form set forth in the regulations. 26 CFR §301.7433-1(d). An exception to this rule is provided with respect to civil actions filed in federal district court prior to July 31, 1996. Under this exception, if an administrative claim is filed during the last six months of the period of limitations for filing a civil action for damages under section 7433 of the Code, administrative remedies shall be considered exhausted on the date the administrative claim is filed. The exception was included in the current regulations because, prior to the enactment of TBOR2, the failure to exhaust administrative remedies was a jurisdictional bar to an action. Without the exception, if a taxpayer filed an administrative claim during the last six months

of the period of limitations and the IRS did not consider the claim before the limitations period expired, the taxpayer automatically would have been barred from filing suit. These provisions still apply to actions that were filed on or before July 30, 1996, the enactment date of TBOR2.

With respect to actions filed after July 30, 1996, the proposed regulations do not contain the exception for administrative claims filed during the last six months of the period of limitation because the failure to exhaust administrative remedies is no longer a bar to an action. Since the enactment of TBOR2, the failure to exhaust administrative remedies is just one factor the court may consider in determining whether to reduce an award of damages. Pursuant to the notice of proposed rulemaking, if a taxpayer waits until the last six months of the period of limitations to file an administrative claim, the IRS does not reach a determination before the limitations period expires, and the taxpayer files a timely action under section 7433, the court may consider the facts and circumstances of the case and decide what effect the late filing of the claim should have on the amount of damages awarded.

The proposed manner and form for filing an administrative claim for damages remain the same as those set forth in the current regulations at 26 CFR 301.7433-1(e)(1) and (2). The claim must be sent in writing to the district director (marked for the attention of the Chief, Special Procedures Function) of the district in which the taxpayer resides. The claim must include: (1) the name, current address, current home and work telephone numbers and any convenient times to be contacted, and taxpayer identification number of the taxpayer making the claim; (2) the grounds, in reasonable detail, for the claim (include copies of any available substantiating documentation or correspondence with the Internal Revenue Service); (3) a description of the injuries incurred by the taxpayer filing the claim (include copies of any available substantiating documentation or evidence); (4) the dollar amount of the claim, including any damages that have not yet been incurred but which are reasonably foreseeable (include copies of any available substantiating documentation or evidence); and (5) the signature of the taxpayer or duly authorized representative.

The notice of proposed rulemaking does not have a new effective date paragraph because amended paragraphs (a), (d), and (e) set forth the effective dates of the new statutory provisions as well as the statutory provisions they are replacing.
Special Analyses

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in EO 12866. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because the regulation does not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Pursuant to section 7805(f) of the Internal Revenue Code, this notice of proposed rulemaking will be submitted to the Chief Counsel for

Advocacy of the Small Business Administration for comment on its impact on small business.
Comments and Requests for a Public Hearing
    Before these proposed regulations are adopted as final regulations, consideration will be given to any written comments that are submitted timely (a signed original and eight (8) copies) to the IRS.  All comments will be available for public inspection and copying.  A public hearing may be scheduled if requested in writing by a person that timely submits written comments.  If a public hearing is scheduled, notice of the date, time, and place for the hearing will be published in the Federal Register.
Drafting Information
    The principal author of these regulations is Kevin B. Connelly, Office of Assistant Chief Counsel (General Litigation) CC:EL:GL, IRS.  However, other personnel from the IRS and Treasury Department participated in their development.
List of Subjects in 26 CFR Part 301
    Employment taxes, Estate taxes, Excise taxes, Gift taxes, Income taxes, Penalties, Reporting and recordingkeeping requirements.
Proposed Amendments to the Regulations
    Accordingly, 26 CFR part 301 is proposed to be amended as follows:
PART 301--PROCEDURE AND ADMINISTRATION
    Paragraph 1.  The authority citation for part 301 continues to read in part as follows:
    Authority:  26 U.S.C. 7805 * * *
    Par. 2.  In §301.7433-1, paragraphs (a), (d), (e), and (f) are revised to read as follows:
§301.7433  Civil cause of action for certain unauthorized collection actions.
    (a) In general.  If, in connection with the collection of a federal tax with respect to a taxpayer, an officer or an employee of the Internal Revenue Service recklessly or intentionally disregards any provision of the Internal Revenue Code or any regulation promulgated under the Internal Revenue Code, such taxpayer may bring a civil action for damages against the United States in federal district court.  The taxpayer has a duty to mitigate damages.  The total amount of damages recoverable is the lesser of $1,000,000 ($100,000 if the act giving rise to damages occurred before July 31, 1996) or the sum of--
    (1) The actual, direct economic damages sustained as a proximate result of the reckless or intentional actions of the officer or employee; and
    (2) Costs of the action.
* * * * *
    (d) Exhaustion of administrative remedies in suits brought prior to July 31, 1996--(1) General.  With respect to civil actions filed in federal district court prior to July 31, 1996, no action may be maintained before the exhaustion of administrative remedies.  Administrative remedies are exhausted on the earlier of the following dates--
    (i) The date the decision is rendered on an administrative

claim filed in accordance with paragraph (f) of this section; or
     (ii) The date six months after the date an administrative
claim is filed in accordance with paragraph (f) of this section.
     (2)   Exception.  If an administrative claim is filed in
accordance with paragraph (f) of this section during the last six
months of the period of limitations described in paragraph (g) of
this section, the taxpayer may file an action in federal district
court any time after the administrative claim is filed and before
the expiration of the period of limitations.
     (3)   No action in federal district court for any sum in
excess of the dollar amount sought in the administrative claim.
With respect to civil actions filed in federal district court
prior to July 31, 1996, no action may be instituted for any sum
in excess of the amount (already incurred and estimated) of the
administrative claim filed under paragraph (f) of this section,
except where the increased amount is based upon newly discovered
evidence not reasonably discoverable at the time the
administrative claim was filed, or upon allegation and proof of
intervening facts relating to the amount of the claim.
     (e) Exhaustion of administrative remedies in suits brought
after July 30, 1996--(1) General.  With respect to civil actions
filed in federal district court after July 30, 1996, the amount
of damages awarded under paragraph (a) of this section may be
reduced if the court determines that the taxpayer has not
exhausted the administrative remedies available within the
Internal Revenue Service.
     (2) Administrative remedies exhausted.   Administrative
remedies shall be considered exhausted on the earlier of--
     (i) The date the decision is rendered on a claim filed in
accordance with paragraph (f) of this section; or
     (ii) The date six months after the date an administrative
claim is filed in accordance with paragraph (f) of this section.
     (f) Procedures for an administrative claim--(1)Manner.  An
administrative claim for damages shall be sent in writing to the
district director (marked for the attention of the Chief, Special
Procedures Function) of the district in which the taxpayer
resides.
     (2)  Form.  The administrative claim shall include--
     (i) The name, current address, current home and work
telephone numbers and any convenient times to be contacted, and
taxpayer identification number of the taxpayer making the claim;
     (ii) The grounds, in reasonable detail, for the claim
(include copies of any available substantiating documentation or
correspondence with the Internal Revenue Service);
     (iii) A description of the injuries incurred by the taxpayer
filing the claim (include copies of any available substantiating
documentation or evidence);
     (iv) The dollar amount of the claim, including any damages
that have not yet been incurred but which are reasonably
foreseeable (include copies of any available substantiating
documentation or evidence); and
     (v) The signature of the taxpayer or the taxpayer's duly
authorized representative as defined in paragraph (f)(3) of this
section.

(3) Duly authorized representative.  For purposes of paragraph (f)(2)(v) of this section, a duly authorized representative is any attorney, certified public accountant, enrolled actuary, or any other person permitted to represent the taxpayer before the Internal Revenue Service who is not disbarred or suspended from practice before the Internal Revenue Service and who has a written power of attorney executed by the taxpayer.
* * * * *

                    Michael P. Dolan
          Deputy Commissioner of Internal Revenue

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
)
)
Plaintiff, )
)
vs. ) CASE NO. 06-CR-62-TCK
)
)
RICHARD MAYNOR BLACKSTOCK, )
)
)
Defendant. )

TRANSCRIPT OF PROCEEDINGS
JUNE 19, 2006
BEFORE THE HONORABLE TERENCE KERN, DISTRICT JUDGE
JURY TRIAL - VOLUME I

APPEARANCES:

For the Plaintiff: MS. LORETTA RADFORD
MR. KENNETH SNOKE
U.S. Attorney's Office
110 W. 7th St., Ste 300
Tulsa, Oklahoma 74119

For the Defendant: MR. OSCAR STILLEY
Attorney at Law
2120 North B Street
Ft. Smith, Arkansas 72901

INDEX

**WITNESSES ON BEHALF OF THE PLAINTIFF** **PAGE**

**ROBERT DEAN**

Direct Examination by Mr. Snoke 3

PROCEEDINGS

* * * * * * *

June 19, 2006:

(Voir dire and opening statements were had but not designated as part of this record.)

THE COURT: Government may call its first witness.

MR. SNOKE: Government would first call Bob Dean. Your Honor, I have copies here in books. Do you want me to put these in front of him?

THE COURT: You may.

(Witness sworn.)

BOB DEAN,

Called as a witness on behalf of the plaintiff, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SNOKE:

Q. Would you state your name and spell your last name for the court reporter please, sir.

A. Bob Dean, D-E-A-N.

Q. What's your business or occupation, Mr. Dean?

A. I'm custodian of records for the Internal Revenue Service.

Q. And what do you do in that capacity?

A. I assist with preparing documents for trial, research, and testifying to those documents in trial and about processes at the processing center.

Q. And where is the processing center?

A. I work in Austin, Texas.

Q. Does Austin, Texas have a system whereby you can retrieve documents with their file no matter where they're filed?

A. Yes, that's correct.

Q. That would include documents that would have been filed both in the Northern District of Oklahoma throughout Oklahoma and maybe even in states such as Georgia or Texas?

A. Yes. Our system, I get access to any records that are filed anywhere in the United States.

Q. How long have you worked for the IRS, sir?

A. Twenty-one years.

Q. And have you worked in any other capacities there with the IRS in that 21 years?

A. Yes. I've worked in processing. I've worked in business center reporter programs and a manager of different groups.

Q. Before you there, I have placed several notebooks. If you'll start on your left there, I believe with the first notebook that contains a number of exhibits beginning with Exhibit No. 1. Can you take a look at that, please. And if you will tell me -- first of all, can you tell us generally what that is?

A. This is a Form 1040X that was submitted for tax year 1998 for Michael Polay and Wendy Weisberg.

Q. Is this a true and correct copy of that tax form that was

received by the IRS?

A. Yes, it is.

Q. And it came from the files and records that you have just discussed there in your records center in Austin, Texas?

A. Yes. They came from IRS records.

Q. Does it contain all the attachments that came with that? Looks like even the last page there is an envelope with --

A. Yes.

Q. -- sort of a postage mark.

A. Right. It has copies of everything.

Q. All right.

MR. SNOKE: We would move into evidence Government's Exhibit 1 at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) What does it show on Government's Exhibit 1 as the date of -- the first date of receipt on that exhibit?

A. The first date of receipt was September 24 of 2002.

Q. Going back -- that's a 1040X form?

A. That's correct.

Q. If you'll go to page 3 of that -- actually, it's the first page of Schedule A., appears to be line 27. We're now on -- I'm showing on the screen -- do you have your screen on in front of you?

A. Yes, I do.

Q. On line 27 there, can you read line 27 there for us. Read the question and the answer and the amount shown.

A. Line 27 is for other miscellaneous deductions, and it shows, "A deduction and claim of right founded on U.S.C. 26, 1341, compensation for personal labor," and it shows an amount of $108,755.

Q. All right. Now, turning back to the first page of Exhibit 1, sir, if you will tell me, is there a preparer's signature on that first page there?

A. No, there's not.

Q. Let's go to Exhibit 1-A. Tell the Court and the jurors what Exhibit 1-A is.

A. 1-A is a certified transcript of an account for Michael Polay for tax year 1998.

Q. That's the same year we just identified Exhibit 1 as being filed for that year, 1998 tax year?

A. Yes, that's correct.

Q. Okay. And is that a record maintained there in the Austin service center as a true and correct record of what you've got?

A. Yes. This is information from the computer system, like a transcript of an account, similar to a statement you would get from your bank or your credit card company.

MR. SNOKE: We move into evidence at this time Exhibit 1-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) If you would next look at Exhibit 2. Tell us with respect to Exhibit 2 what that is, sir.

A. This is a 1040X. It's an amended individual income tax return for Michael Polay and Wendy Weisberg for tax year 1999.

Q. This is the next year then?

A. That's correct.

Q. Again, it's a 1040X. Would you tell the jurors what a 1040X form is.

A. A 1040X is used --

Q. Wait. Let me get this in evidence first. And it's a true and correct copy, right?

A. That's correct.

MR. SNOKE: We move in evidence Exhibit 2.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Now you can tell the jurors. What is a 1040X?

A. 1040X is what a taxpayer would use to change the information that was originally filed on a Form 1040 if there is some information that came in later, such as other income or other deductions that they might report that would change the amount of tax owed or not owed.

Q. All right. Can you tell us before we leave the first page of that exhibit, did anybody sign as a preparer down there,

Mr. Blackstock or anybody else, as a preparer on this document?

A. No. There's no paid preparer signature.

Q. Then going back to the first page of the Schedule A there again in line 27, would you tell us, does that have -- again, read the question and the answer and the amount claimed for the deduction on that form.

A. Okay. That's for other miscellaneous deductions, and it states, "A deduction and claim of right founded under Title 26, 1341, compensation for personal labor," and it was for $95,135.

Q. So, in essence, in this tax return with that notation there on line 27 of the Schedule A, what are the taxpayers asking to -- what are the taxpayers asking for there, if you can tell?

A. What they're doing is they're reporting income on line 1 of the 1040X and then they're removing it as itemized deductions, so then, in effect, their taxable income would be zero.

Q. Now would you look at Exhibit 2-A for me, please. Tell me what that is.

A. 2-A is the certified transcript of the account for Michael Polay for the tax year 1999.

Q. That's the same year in which we just got that report in Exhibit 2?

A. That's correct.

MR. SNOKE: We move into evidence Exhibit 2-A at this

time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Next, if you would look at -- I didn't ask you the filing date on that one. Let's go back to Exhibit 2 and tell me what the filing date is on Exhibit 2.

A. This shows a received date of December 11, 2002.

Q. But it's for the '99 tax year; is that correct?

A. Correct.

Q. Is there some provision in the Internal Revenue Code regarding the number of years you can go back and file amended returns for --

A. Generally --

Q. -- if you know?

A. Generally it's up to three years after a return was filed, but it depends upon other information on there, but that's the general rule.

Q. So we've identified a filing in September '02 in Exhibit 1 for the '98 year and in December of '02 for the 99 tax years so far, right --

A. That's correct.

Q. -- for Mr. Polay. Let's go to Exhibit 3, please. Tell the Court and the jury what that is, sir.

A. This is a Form 1040X amended income tax return for tax year 2000 for Michael Polay and Wendy Weisberg.

MR. SNOKE: May I have a minute, Your Honor?

THE COURT: You may.

Q. (By Mr. Snoke) This is a true copy of the records that you have down there, true and accurate copy of it?

A. That's correct.

Q. As filed?

A. Yes, it is.

Q. Then the filing date on Exhibit 3?

A. It shows December 11, 2002.

Q. And again, is this one signed in any way by any tax preparer?

A. No, it's not.

Q. Again, going to the first page of Schedule A of that exhibit. Wait a minute.

MR. SNOKE: Let's move that into evidence -- Exhibit 3 into evidence at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) And before we go on to 3-A, let's go back for a moment to 1-A and look at that for a moment. And tell me if it -- Exhibit 1-A you testified, I believe, was the transcript of the 1040X or at least for Mr. Polay for the '98 -- 1998 tax year; is that correct?

A. Yes.

Q. And we've had a -- this 1040X Exhibit 1 filed on 9/14/02,

does that show on the transcript there?
A. Yes. It's the third entry down where it shows "amended return filed."
Q. And does it show that that claim was disallowed?
A. Yes. About three months later, a letter was sent to Mr. Polay saying that the 1040X was not allowed.
Q. That date on there is 12/30/02?
A. That's correct, yes.
Q. Let's do the same thing with respect to the '99 tax year in Exhibit 2-A, please, Exhibit 2-A. You testified that Exhibit 2, the 1040X for '99 -- 1999 for Mr. Polay was filed December 11 of '02 as shown on the tax -- on the filing stamp. And does that show that that was -- 12/11/02, I'm sorry. Does that show on the -- you may have a hole in your copy, but if you look on the screen there --
A. Right. There was the amended return filed on 12/11/02.
Q. All right. Let's see, above it for some reason, I guess we have a --
A. There was a previous one that had been filed in September of '02, and that was disallowed.
Q. All right. Then we have -- all right. Let's go to Exhibit 3-A then. We just did 3. And tell me what Exhibit 3-A is.
A. This is the certified transcript for Michael Polay for tax year 2000.

Q. And that, again, came from the records down in Austin there, the IRS?

A. Yes, it did.

Q. And for the year 2000, have we established when that -- we did establish when that was filed. So let's move on to --

MR. SNOKE: Let's move that into evidence, Exhibit 3-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) All right then. Exhibit 4 -- before we leave 3-A, can we tell whether -- can we tell whether that claim in Exhibit 3 was paid or whether it was disallowed?

A. Well, there was one that came in prior 9/24, just like in the other one, and that was disallowed in February of '03. And then the one came in in the meantime in December of '02, but that -- there was ultimately an assessment by examination of tax.

Q. All right. Let's go to Exhibit 4. Tell us the same thing with respect to Exhibit 4, will you, please, sir. What is it? This is a 1040 form, isn't it?

A. This is a Form 1040 for 2001 tax year for Michael Polay.

Q. All right. What would be the circumstances of filing a 1040 or -- versus a 1040X?

A. Generally, a 1040 needs to be filed before the 1040X, because you have to have the original return before you change

anything.

Q. Can a 1040X be filed if the IRS has done a substitute for return for the taxpayer?

A. Yes, because there is information sent to the taxpayer saying these are what the IRS proposes to be your income and tax due, and then the taxpayer can come back and say, well, no, these are the changes that I want to make to your proposal.

Q. So the IRS will accept a 1040X on a taxpayer who didn't file a 1040 but for whom they have done a substitute return?

A. Yes, that's correct.

Q. Again, this is from Mr. Polay for the year 2001?

A. Yes, that's true.

MR. SNOKE: We would move into evidence Government's Exhibit 4 at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Can you tell us what the -- I think I skipped this on some of the interim ones, but the date of filing on this, the earliest date of filing?

A. This shows to be received December 12th of 2002.

Q. And going to the Schedule A -- or may be in a different place on this 1040 -- no, it's still in Schedule A, line 27. Does this have the same language as the previous two that you talked about -- previous three, I guess?

A. Right. It talks about a claim of right deduction, and it

shows $107,514.

Q. All right. Look at 4-A, then, please, for me. Tell me what that is.

A. This is the certified transcript for Michael Polay for tax year 2001.

Q. All right. Again, is that document an accurate copy of what the records show for the IRS?

A. Yes.

MR. SNOKE: We move into evidence 4-A at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Let's go to 5 then. Again, the same questions with respect to 5. It's still Mr. Polay?

A. Yes.

Q. What tax year is this for?

A. This is Form 1040 for 1997 for Michael Polay.

Q. All right. Again, a true and accurate copy of the records?

A. Yes, that's true.

Q. Including -- I think the last page there is actually an envelope. Do they usually keep the envelopes that the taxpayer mails in its tax returns?

A. Only if it's received after April 15.

Q. All right. Well -- okay. Then this one was, I guess?

A. This was a late-filed return, it appears, because it was

received late -- or after 1998.

MR. SNOKE: We'll move into evidence Exhibit 5 at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Tell us with respect to Exhibit 5 when it was received by the IRS.

A. It appears to have a earliest date of February 13, 2003.

Q. Going to the third page there, the first page of the Schedule A, again the same language there on line 27 typed in by the taxpayer or his representative.

A. It shows the claim of right deduction of $63,722.

Q. That pretty much -- actually, go back to the first page of that tax return on Exhibit 5. Is that the total amount of income there for that year?

A. Yes, that's the total amount of income.

Q. So he's listed it as wages and salaries there on line 7, and it comes down there to line 32; his adjusted gross income is still 63,722; is that correct?

A. Correct.

Q. Over there on Schedule A, he's taking it all back off by claiming it as a deduction; is that correct?

A. Right. By removing it, then he shows zero for taxable income.

MR. SNOKE: We move into evidence 5-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) All right. Now, 5-A is the transcript; is that correct?

A. Yes.

Q. For the same year, 1997, for Mr. Polay?

A. This is the transcript for '97.

Q. It goes with Exhibit 5, which was the 1040 tax return, correct, same year, 1997?

A. Yes.

Q. Let's go to Exhibit 6. Is that a 1040X again from your records at the IRS?

A. Yes, it is. It's a 1040X for tax year 1999 for Bradley and Bonnie White.

Q. For the tax year 1999; is that correct?

A. Yes.

Q. All right.

MR. SNOKE: Again, we would move into evidence Exhibit 6.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Again, as you've done before, would you tell us, first of all, is there anybody's name down there on preparer's line?

A. No, there's not.

Q. Mr. Blackstock's name doesn't appear anywhere on that document?

A. No.

Q. At least on the front page?

A. No.

Q. If you want to look back through there, I think -- I don't think you'll find his name anywhere. But there are some things attached to that, of course, to that tax return; is that correct?

A. There are, but I don't see Mr. Blackstock's signature.

Q. All right. What was the earliest filing date on that document when it was filed?

A. It shows a received date of December 2 of 2002.

Q. And the -- going to the first page of Schedule A, what is the amount of deduction?

A. The claim of right deduction, is for $77,201.

Q. All right. There's some other deductions on this particular tax return; is that correct?

A. Yes. Some state and local income taxes, property taxes and mortgage interest.

Q. Let's go to Exhibit 6-A. Is that the matching transcript for this taxpayer for that tax year, which was 1999?

A. Yes, it is.

MR. SNOKE: Move into evidence 6-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Go to 7 next, Exhibit 7. Again, we have a 1040X form for the year 2000, do we?

A. Yes, there is.

Q. Again for Bradley and Bonnie White?

A. That's correct.

Q. And again, it's your records -- taken from your records there at the IRS?

A. Yes, it is.

MR. SNOKE: Move into evidence 7.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Filing date on -- earliest filing date on Exhibit 7, was it 12/7/02?

A. That's correct.

Q. Again, any indication Mr. Blackstock was involved in this, preparing this tax return?

A. No, I didn't see a signature.

Q. He's not down there as a preparer?

A. No.

Q. Going to the Schedule A, what is the amount -- the claim of right compensation for personal labor they're deducting on the first page of Schedule A?

A. The deduction is for $80,678.

Q. 7-A. Again, transcript that goes with this?

A. Yes, that's correct.

Q. For that year --

A. For 2000.

Q. -- 2000 year?

MR. SNOKE: Move into evidence 7-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) I skipped one here. We have to go back for one year. 6-D. If you'll look at 6-D briefly, which is for the 1999 tax year.

A. Okay.

Q. Can you tell me what that is, sir?

A. This is a copy of a letter that was mailed from the Internal Revenue Service to Bradley and Bonnie White concerning tax years 1999 and 2000.

Q. That's an accurate copy of the IRS copy of that letter?

A. Yes, it is.

MR. SNOKE: Move into evidence 6-D at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Please tell the jury a little bit about this letter that's up there on the screen there. And I realize it's a little hard to see maybe. It's standard typing. But tell us what that letter is, please, sir.

A. This letter is in response to the documents that Bradley

and Bonnie White had submitted to the Internal Revenue Service, and it was a letter stating that they have determined the documents that they sent in is a frivolous document, no basis in law, and represents a frivolous position.

Then it goes on down further that there could be a $500 penalty for each frivolous return or document filed. And then it gives other instructions that if they sign certain forms, they'll -- the IRS will disregard the previous documents filed and not assess the frivolous return penalties.

Q. If they file a properly signed 2297 and 3363. What are those forms?

A. Those are forms filed that the person -- that the person who submitted these can say that they revoke what they sent in.

Q. What was the date of this letter sent out by the IRS?

A. This was sent out March 18th of 2003.

Q. Going back to exhibit -- this has to do with the '99 and 2000 tax years; does it not?

A. That's correct.

Q. Shows on the upper right-hand side of that. And Exhibit 6 had to do with the '99 tax year and I guess Exhibit 7 had to do with the 2000 tax year we just identified and moved into evidence; is that correct?

A. That's correct.

Q. They're telling them both with respect to both Exhibit 6 and Exhibit 7 that they are rejecting those as frivolous?

 A. That's correct.

Q. We showed that the filing date on Exhibit 6 was 12/02/02 and the one on 7 was 12/07/02, and this letter is dated in March of '03; is that correct?

A. That's correct.

Q. All right. Let's go on then back into the 7s again, and we did 7 and 7-A. Let's go to Exhibit 7-B.

MR. SNOKE: Did I move in 6-D in evidence?

THE CLERK: You did.

Q. (By Mr. Snoke) All right. 7-B is the next one I have down here. And that may be a similar document to the one we just discussed.

A. 7-B is the same as 6-D, but because it's for the next tax year for 2000, there were two different copies made.

Q. It goes with Exhibit 7. And we had the other one with Exhibit 6; is that right?

A. Correct.

Q. But the same letter covered both tax years that we pointed out there when we had it on the screen.

A. Right.

MR. SNOKE: Move into evidence 7-B.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Let's look at 7-C. Tell us what 7-C is.

A. 7-C is a print of an electronically filed return for

Bradley and Bonnie White for tax year 2000.

Q. That's the same year we've been talking about here in Exhibit 7, elsewhere in Exhibit 7?

A. Correct.

Q. And what is this they're -- this is a Form 1040 electronically filed; is that right?

A. That is correct.

Q. It's a correct copy from the records of the IRS?

A. Yes.

MR. SNOKE: Move into evidence 7-C.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Now, on 7-C is actually the original -- well, tell us what the filing date is on 7-C.

A. 7-C was received around -- well, it was received around February 12th of 2001.

Q. And can we look at the transcript and tell when that was -- which is 7-A?

A. Yes. That's why I had to look at the right-hand side because this was the timely filed tax return for tax year 2000.

Q. So it was on or before April 15th of 2001, then, or something?

A. Right.

Q. So this is the original tax filing for the year 2000, and then Exhibit 7 is the amended one that they did under the --

under the claim that compensation for labor was not -- was deductible; is that correct?

A. That's right.

Q. Let's look at Exhibit 8. What is Exhibit 8?

A. This is a true copy of Form 1040X for Tracy Whyburn for tax year 2001.

Q. Again, true and correct copy from the IRS files?

A. Yes.

MR. SNOKE: Move into evidence 8 at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) As we did with the others, Mr. Blackstock's name is not down there as a preparer. In fact, there's no name as a preparer, right?

A. No, there's no name.

Q. And the received date for this 2001 tax return for Mr. Whyburn?

A. December 4th of 2002.

Q. Turning to the line 27 of Schedule A, what is the compensation for personal labor deduction that is on there?

A. Claim of right deduction, is for $36,378.

Q. All right. It also says compensation for personal labor, doesn't it?

A. For personal labor, yes.

Q. All right. Going back to the first page of that document,

that doesn't -- the adjusted gross income is what -- was originally what, as listed on the 1040X form?

A. Originally adjusted gross income was shown as $38,941.

Q. So this isn't the total amount, but it does take a lot of --

A. Well, whenever they add in all the other deductions that they had, it would total up to $54,000.

Q. That means that he is claiming a refund, actually?

A. That's correct, yes.

Q. Exhibit 8-A, again, is that the transcript for this tax year for this taxpayer --

A. Yes, it is.

Q. -- Mr. Whyburn?

MR. SNOKE: Move into evidence 8-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) 8-B. Look at 8-B for a minute. What is 8-B?

A. 8-B is another copy of the letter from the Internal Revenue Service to Tracy Whyburn.

Q. Is that the same kind of letter that we talked about before that went to -- the same letter that was identified as going to earlier taxpayers?

A. Yes.

MR. SNOKE: We'd move into evidence 8-B.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) All right. Again, if we can look at 8-B for a minute. We established that the tax return, the 1040X for the year 2001, was filed in December of '02 by Mr. Whyburn?

A. Correct.

Q. And we established the amount that he was claiming. And what's the date of this letter?

A. This was dated June 20th of 2003.

Q. And does that -- going to Exhibit 8-A, does any of that filing -- or show up on -- it shows the amended return filed on 12/04/02, right?

A. That's correct.

Q. Doesn't show the -- the letter wouldn't show there normally -- the letter going out wouldn't show it?

A. No, it would not.

Q. All right. And again, that's for the 2001 tax year for Mr. Tracy Whyburn. Let's move on to Exhibit 8-C. Tell us what this document is.

A. This is a return print for tax year 2001 for a Form 1040 for Tracy Whyburn.

Q. This is originally the 2001 return he filed?

A. Yes. That was what was originally filed in 2002.

Q. And it was -- we established that he's trying to get back 36,378 with the 1040X return. Does that amount show up

somewhere on this tax return, which is the one he originally filed?

A. Yes. On line 7.

Q. As wages, salaries, tips, etcetera?

A. Yes.

Q. And what is his total adjusted gross income for that year?

A. Total was 38,941.

Q. We discussed those numbers back when we were looking at the 1040X. Was that electronically filed?

A. Yes.

Q. Timely filed?

A. Yes.

Q. It doesn't have a stamp on it because it was timely filed; is that correct?

A. There wouldn't be a stamp on an electronic return.

Q. We know it was -- for the 2001 year, it must have been filed before April 15, 2002?

A. Electronic returns are generally accepted by the IRS up through October 31st of that year.

Q. So we can't tell exactly when that was filed?

A. From the transcript, it was received around August 5th of 2002, because there had been an extension filed.

Q. All right. About four months before the 1040X was filed --

A. Yes.

Q. -- in December.

MR. SNOKE: We move 8-C into evidence.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Again 9, another 1040X form for Mr. Whyburn for the 2000 tax year?

A. Yes, it is.

Q. Same questions. It's the official record?

A. Yes.

MR. SNOKE: Move into evidence 9.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Again, no preparer's name on this document?

A. No, there's not.

Q. What's the filing date on this?

A. It was received January 6th of 2003.

Q. And the amount of claim of right compensation for personal labor on line 27 that he wants deducted?

A. That was for a deduction of $33,047.

Q. Exhibit 9-A. It's a transcript for this tax year for this taxpayer?

A. Yes, it is.

MR. SNOKE: Move into evidence 9-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Let's go to 9-B. Another one of these letters to Mr. Whyburn regarding this tax year, the 2000 tax year?

A. Yes, it is.

Q. Same -- about the same language as we published here before?

A. That's correct, yes.

MR. SNOKE: Move into evidence 9-B.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) What's the date that that letter went out to Mr. Whyburn regarding his January 1040X form that we just talked about in Exhibit 9?

A. November 21st of 2003.

Q. It took them almost a whole year before they actually rejected this one; is that correct?

A. It depends upon how busy they are.

Q. I see. Now, look at 9-C. What is 9-C?

A. This is the original 1040 return for Tracy Whyburn for 2000.

Q. Electronically filed, as the other one?

A. Yes.

Q. Timely filed?

A. Yes, it was.

MR. SNOKE: Move into evidence 9-C.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Let's go to 10. What is 10?

A. Ten is a 1040X for 2001 tax year for Timothy and Linda Ophoff.

Q. That's O-P-H-O-F-F?

A. That's correct.

Q. Again, from your records there?

A. Yes, it is.

Q. Including all the attachments that were sent with this filing, correct?

A. Correct.

MR. SNOKE: Move into evidence 10.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Filing date on 10?

A. Shows received February 2nd of '03.

Q. Page 3, the amount of income that's being deducted as claim of right deduction is how much, line 27 of Schedule A?

A. $90,031.

Q. No tax preparer's name on that one either?

A. No, there's not.

Q. Exhibit 10-A, is that the transcript for this tax year for these taxpayers?

A. Yes, it is.

MR. SNOKE: Move in evidence 10-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Let's go to 10-C. And tell us what that is.

A. This is another one of those letters concerning frivolous documents for Timothy and Linda Ophoff for 2001 tax year.

Q. This one -- what's the date on this one? Did this one go out from the Internal Revenue Service?

A. May 23rd of 2003.

MR. SNOKE: Move into evidence at this time Exhibit 10-C.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) That's for the 2001 tax year; is that right?

A. That's correct.

Q. This one has -- some of the others may have also, but this one has another received date stamp down near the bottom of it; is that correct?

A. Yes. There was a received date stamp that it was received in Ogden in June 26th of '03.

Q. It was received back -- it went out May 23rd, comes back on June 26th of 2003; is that correct?

A. Yes, that's correct.

Q. Do you know -- well, let's look at -- incidentally, on these dates that are up there, can you explain to the Court and the jury the date of May 23 on the top of this letter, 10-C, May 23, 2003, what does that mean -- when is it going to be mailed out by the IRS?

A. It's mailed out by at least May 23, generally a day or two in advance, hopefully so that the person would receive it on the date of the letter.

Q. This would have gone out from -- this one would have gone out from Ogden, Utah; is that right?

A. Yes.

Q. Which is the return address on it.

Let's look at Exhibit 10-D, then, for a moment. Again, these have similar received Ogden, Utah stamps on them, on these documents. Can you tell us what they are. There's also a 1040X, another copy of that.

A. Yes, this showed received in Ogden on June 26th of 2003.

Q. Is that a document that's from the records of the IRS there in -- that you are certifying here today?

A. Yes.

Q. So that was received by Ogden and all the documents attached -- I think you'll find they all have the same June 26, 2003 received stamp in Ogden; is that right?

A. Yes. They apparently stamped every page.

MR. SNOKE: We move into evidence Exhibit 10-D at this time.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Now, that date is the same -- June 26, 2003 is the -- which you said was on -- appears on Exhibit 10 -- I'm sorry, 10-D is the same date that appeared on 10-C --

A. Yes.

Q. -- the letter with the frivolous filing notification letter, right?

A. It would appear that the Ophoffs sent the whole thing back with a copy of the letter that we sent out with this additional information back to the frivolous filer program.

Q. That did not then comport with the -- with withdrawing their -- with withdrawing their previously filed 1040X and filing of Form 2297 or 3363?

A. Correct. Those forms weren't attached.

Q. So they -- instead of doing that, they sent back this package that you've identified, Exhibit 10-D; is that correct?

A. Yes.

Q. Then 10-D starts off with a letter to the Internal Revenue Service in Ogden, says "Formal Protest of 1040X for 2001"; is that right?

A. Correct.

Q. Kind of a typed letter there?

A. Yes.

Q. Signed by -- apparently signed by the Ophoffs?

A. Yes, it is.

Q. Without going through every page of that, let's go to -- next to Exhibit 10-E. Tell us what that is.

A. This is the tax return for Timothy and Linda Ophoff for 2001.

Q. This is the next year, I guess. The other one was for -- Exhibit 10 was for the year 2000?

A. I'm --

Q. I beg your pardon. This is the same tax year 2001, but I guess this is the original filing by them?

A. This is what they originally sent in.

Q. 1040 --

MR. SNOKE: We move into evidence 10-E.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) All right. Again, now, this being a 1040, this actually has the signatures on the second page of it, does it not?

A. Yes, it does.

Q. About when -- well, we can't tell. The first page, there's no stamp, so that means it was probably timely filed; is that correct?

A. No. There's a stamp that it was received August 19th of

2002.

Q. Okay. Yeah, I see it -- on the lower left-hand corner.

A. They had filed an extension of time to file.

Q. This is -- IRS Memphis received this?

A. Yes.

Q. All right. August 19. So they were a little late. They were within the extension, I guess?

A. Yes.

Q. On the second page, again, because -- the signature is on the second page. And in addition to the Ophoffs' apparent signatures there, there is a preparer's signature on this one, the one that they originally filed; is that correct?

A. Right. There's a Matthew P. Fisher out of Broken Arrow, Oklahoma.

Q. Let's go on to 11. Again, 11 is also for the Ophoffs, Timothy and Linda, 1040X form amended return for the year 1999; is that correct?

A. That's correct.

MR. SNOKE: Move into evidence 11.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) What's the filing date on that?

A. This shows -- looks like we received -- there's several received dates. Looks like February 3rd of 2003.

Q. All right. That's the earliest one stamped on there that

you can find?

A. That's what it appears, yes.

Q. Again, no preparer's signature on the 1040X form?

A. No.

Q. And turning to page 3, the amount of claim of right, compensation for personal labor claimed on this particular 1999 1040X form is how much?

A. Deduction for $83,136.

Q. Let's move to Exhibit 11-A. Is that a transcript covering this year for the Ophoffs?

A. Yes.

Q. The '99 tax year?

A. Yes, it is.

MR. SNOKE: Move into evidence 11-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) All right. Let's look at 11-B. Again, this is another one of these letters indicating that there's no basis in law and that this represents a frivolous position that they've taken for the filing of the 1040X for 1999?

A. Yes, that's correct.

MR. SNOKE: Move into evidence 11-B.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Again, the date, I think, is similar to

the ones we've seen earlier, May 23, 2003?
A. Correct.
Q. Down at the bottom of this one, again, it's stamped June 26, 2003. Another familiar date for the Ophoffs?
A. Right.
Q. Same date we just saw on the previous exhibit of theirs?
A. Yes.
Q. And if you'll look at 11-C. Also a record from the IRS filing, documents filed by the Ophoffs there with the IRS?
A. This appears to have been with the return of this letter.
Q. It also has the same June 26, 2003 stamp on every page --
A. Yes, it does.
Q. -- as did the one for the previous tax year by the Ophoffs; is that correct?
A. Correct.
MR. SNOKE: Move into evidence 11-C.
MR. STILLEY: No objection.
THE COURT: Be admitted.
Q. (By Mr. Snoke) Again, on this -- I don't know if I asked you about the other one. But on this one, counting the letter -- well, the letter went out from the IRS, then it comes back on June 26, from them, of 2003; is that correct?
A. Yes.
Q. And apparently with it is Exhibit 11-C, which is the rest of the documents, indicating that they are basically refiling

this 1040X which is part of this Exhibit 11-C?
A. They're requesting an appeal.
Q. I'm sorry?
A. They're requesting an appeal.
Q. Yeah, okay. So it's basically a request for an appeal?
A. Yes.
Q. The 1040X they've gotten there is similar to the one that they previously filed --
A. Yes.
Q. -- for that tax year?
A. That's correct.
Q. I don't know if I asked you the amount on 11, but I think I did. All right.
A. Yes.
Q. Yeah, I did.

All right. Now, again, on 11-C -- 11-B and C for that matter, but mostly on 11-C there, if you'll look at those documents, again, there's no preparer's signature on the 1040X that's attached to that appeal; is that correct?
A. No, there's not.
Q. And the same amount claimed as compensation for personal labor as a deduction, $83,136 there?
A. That's correct, yes.
Q. Again, Mr. Blackstock -- on those documents, you don't see Mr. Blackstock's name on there anywhere?

A. No, there's not.
Q. Let's go on to --
MR. SNOKE: Let's see, is 11-C in evidence? Move in evidence 11-C.
THE CLERK: 11-C is in evidence. 11-D is not.
Q. (By Mr. Snoke) 11-D then. What is that, sir?
A. 11-D is a true copy of the 1999 1040 for Timothy and Linda Ophoff.
Q. That's their original filing in this case for -- in the '99 tax year, right?
A. Yes.
MR. SNOKE: Move into evidence 11-D then.
MR. STILLEY: No objection.
THE COURT: Be admitted.
Q. Let's go to 12. What is 12?
A. Twelve is a Form 1040 for Timothy and Linda Ophoff for 2000 tax year.
Q. And again, it's a true and correct copy of the records you have for the Ophoffs down in Austin --
A. Yes.
Q. -- the IRS records?
A. Yes.
MR. SNOKE: Move into evidence 12.
MR. STILLEY: No objection.
THE COURT: Be admitted.

Q. (By Mr. Snoke) Now, again, this is a 1040. I guess we need to look at Exhibit 12-A. Is that the transcript for the 2000 tax year for the Ophoffs?

A. Yes, it is.

MR. SNOKE: Move into evidence 12-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Looking at the transcript and at this 1040, did it appear that before this 1040 was filed that the Ophoffs had filed anything for the 2000 tax year?

A. No. This is considered to be the original return for 2000.

Q. There hadn't yet been a substitute return done by the IRS as to that year for those people?

A. No.

Q. On the first page of the 1040, what does it show as wages, salaries and tips that they're putting down there?

A. $95,755.

Q. That comes down as a total adjusted income is -- with about $31 of interest comes to pretty much that same amount; is that right?

A. Yes, that's correct.

Q. Then they have -- over there on Schedule A, line 27, which is the third page of this document, what is the amount?

A. Shows $95,755 deduction as compensation for personal

labor.

Q. Speaking of that, what is -- back on page 1 -- it doesn't show -- never mind. On page 1 -- actually, it's page 2, I guess, on a 1040. Is there any preparer's name down there?

A. No, there is not.

Q. What does it show the occupation of Mr. Ophoff is?

A. He's a painter, and Linda is a teacher.

Q. Let's look at --

MR. SNOKE: Is 12-A in evidence?

THE CLERK: It is.

Q. (By Mr. Snoke) Let's look at 13. What is 13?

A. This is a 1040X for 1999 for Latricia Braddy.

Q. Same record from your files?

A. Yes.

MR. SNOKE: Move into evidence 13.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Is 13-A a transcript for this transaction -- I mean for this tax year for this person?

A. Yes, it is.

Q. That's the '99 tax year?

A. That's correct.

MR. SNOKE: Move into evidence 13-A.

MR. STILLEY: No objection.

THE COURT: Be admitted.

Q. (By Mr. Snoke) Now going back to 13 for Ms. Braddy, this is the first time I think we've heard her name here. What is the filing date for this for her?
A. Shows February 19th of 2003.
Q. Turning to page -- oh, now this one -- look down here at the preparer. Who does it say is the preparer on this one?
A. It shows a Richard Blackstock.
Q. All right. When did he purportedly sign this thing?
A. February 4th of '03.
Q. When did Ms. Braddy purportedly sign this thing?
A. February 9th of '03.
Q. When was it received by the IRS?
A. February 19th of '03.
Q. All right. And down below there, it says -- below the name Mr. Richard Blackstock there, it says, "Firm's name (or yours if self-employed), address and ZIP code." There's something typed in there?
A. It shows Much More Foundation on 3171-A South 129th E. Avenue in Tulsa, Oklahoma.
Q. Number 168?
A. Right.
Q. On page 3, the Schedule A, first page of the Schedule A, line 27, what is -- the compensation personal labor, what is the amount under the deduction there?
A. $28,264.

Q. All right. And does the transcript -- the transcript which is in evidence, does it indicate there had been any kind of a prior filing?

A. Yes. There was a return filed in 2000 for Latricia Braddy.

Q. And let's see. All right. This one was filed, then, in February of '03; is that correct?

A. That's correct.

Q. As a 1040X. Now let's look at next -- skip down to 14, I guess. Again, we have another tax form for Latricia Braddy. This is for the 2000 tax year; is that correct?

A. That's correct.

Q. Received by the IRS?

A. Yes, it was.

MR. SNOKE: Move into evidence 13.

MR. STILLEY: No objection.

THE COURT: Be admitted. Let's take a short break. This is -- I need a little rest from these numbers if you-all don't. So we'll take about ten minutes.

(Whereupon a recess was had.)

THE COURT: You may continue.

MR. SNOKE: Thank you, Your Honor.

Q. (By Mr. Snoke) Mr. Dean, would you turn back to Exhibit 12-A just for a moment. This is Mr. Timothy and Linda Ophoff's tax return for the 2000 tax year in which they filed a 1040

 return, we identified it into evidence as an exhibit. 12-A is the transcript that you identified for that.

Does that show that -- 12-A show that Mr. Ophoff received a refund based on that claim of right, compensation for labor deduction 1040 form that he filed, Exhibit 12.

A. Yes, there was a $6,440 refund that was sent.

Q. All right. Now, when we left off here before the break, we had just moved in Exhibit 14, which was the 2000 year 1040X form for Latricia Braddy. I'm going to just do some -- after talking to counsel, I'm going to do some quick movement here.

MR. SNOKE: I'm going to move into evidence at this time Exhibit 14-A, which is the transcript for the 2000 tax year for Latricia Braddy; 15, which is the 2002 Form 1040X for Latricia Braddy; 15-A, which is a transcript for 2000 tax year for Latricia Braddy. It's Braddy, I guess. 16, which is the 2001 Form 1040X filed by Latricia Braddy for the 2001 tax year; 16-A, the transcript for the 2001 tax year for Latricia Braddy.

17, which is the 1999 Form 1040X return for Franklin Warlick and Denise Warlick for the 1999 tax year; 17-A, the transcript of account for the 1999 tax year for Franklin and Denise Warlick; 18, which is the 2000 Form 1040X tax return for the 2000 year for Franklin and Denise Warlick; 18-A, the transcript for that 2000 tax year for Franklin and Denise Warlick; 18-D, which is a 2000 -- the original 2000 1040X tax

year for the year 2000 received by the IRS; 19, which is a 2001 tax year 1040X tax return for Franklin and Denise Warlick; 19-A, the transcript for Denise and Franklin Warlick for the 2001 tax year.

20, which is the -- a 1999 Form 1040X tax return for a Anthony and Cheryl Bowers; 20-A, the transcript for the 1999 tax year for Anthony and Cheryl Bowers; 20-B, which is a 1999 Form 1040X tax return for Anthony and Cheryl Bowers which was attached as an appeal of Exhibit 20; 20-D, which is the 1999 Form 1040, the original 1040 return filed for 1999 tax year for Anthony and Cheryl Bowers for the 1999 year.

21, which is the 1999 Form 1040X tax return filed by a Jeremy M. Linam; 21-A, the 1999 transcript of account for the 1999 tax year for Mr. Linam; 21-G, an E-filed 1999 Form 1040 tax return filed originally by Mr. Linam before he filed the 1040X as 21-G.

22, which is a 1999 Form 1040 tax return for a Michael Kiselak K-I-S-E-L-A-K; 22-A, the transcript for that 1999 tax account for Mr. Kiselak; 23, which is the 2001 Form 1040 tax return filed by Mr. Michael Kiselak for the 2001 year; and 23-A, which is the transcript of account for 2001 year for Mr. Michael Kiselak; 24, which is the -- a 1040 tax return for Michael Kiselak for the 2000 tax year; 24-A, the transcript for that tax year, the year 2000 tax year, for Mr. Michael Kiselak.

25, which is the -- a 1999 Form 1040X, that is a 1040X for the 1999 tax year filed by Ronald and Donna Cantrell; 25-A, the transcript for that 1999 tax account for Ronald and Donna Cantrell; 25-C is a 1999 Form 1040X tax return again filed as an appeal by Ronald and Donna Cantrell for the 1999 tax year, 25-C, that is; 26, which is the 1040X tax return for Ronald and Donna Cantrell for the 2000 tax year; 26-A, the transcript for that 2000 tax year account for Ronald and Donna Cantrell; 26-E, which is another copy of a 2000 Form 1040X filed by Ron and Donna Cantrell as an appeal of the denial of the original 1040X for the 2000 tax year; and 27, which is Ronald and Donna Cantrell again, a 1040X return filed for the 2001 tax year; 27-A, the transcript for the 2001 tax account for Ronald and Donna Cantrell. There is no 27-B.

27-C is an IRS letter from Ronald and Donna Cantrell dated -- originally went out to them 12/12/03, which they returned withdrawing their filing of the 1040X for the 2001 tax year. 27-C, that is.

27-D is actually the letter going out to them. And 27-D -- 27-D is the letter going out to them, the same letter. Then 27-C is the letter coming back with the received stamp by the IRS. Moving that into evidence, 27-D.

27-E is the 2001 Form 1040 tax return for Ronald and Donald -- Ronald and Donna Cantrell, and that's for the 2001 tax year, the original tax return they filed, before they filed

the Form 1040X.

Exhibit 28, which is the 2001 tax year for Christopher and Mary McNabb, 1040X form filed by them June of '03. 28-A, the transcript for their account, Christopher and Mary McNabb, for the 2001 tax year. 28-B, an IRS letter dated 4/2/04 to Christopher and Mary McNabb with the usual language on it that we've seen before here. And it was received back by the IRS with their appeal -- that's 28-B -- of the denial of their earlier filed 1040X for 2001.

Exhibit 28-E is the original 1040 tax return filed by Christopher Mary McNabb for the 2001 tax year. Exhibit 29 is the 1040X amended tax return for the 2002 tax year for Christopher and Mary McNabb. 28-A is a transcript for the 2002 tax year for Christopher and Mary McNabb.

THE COURT: You said 28-A.

MR. SNOKE: 28-A. I'm sorry. 28-B -- I'm sorry, never mind 28-B. 29 -- I'm sorry, I said 28, didn't I?

29 -- that was 29-A.

29-C is the -- we're moving into evidence, which is the original Form 1040 tax return for Christopher and Mary McNabb for the 2002 tax year filed before Exhibit 29, which was the amended 1040X return.

Exhibit 30 is the -- is a 1040 tax return for Craig and Jennifer Van Patten filed for the 2001 tax year in June of 2003.

30-A is the transcript for the 2001 tax year for Craig and Jennifer Van Patten; 31 is the -- is a 1040 tax return for Jennifer and Craig Van Patten filed for the 2002 tax year in June of 2003; 31-A is the 2002 transcript of the account for Craig and Jennifer Van Patten for the 2002 tax year.

32 is the -- is a 1040 tax return for Craig and Jennifer Van Patten filed in 2000 -- for the 2000 tax year in June of 2003; 32-A, a transcript of the 2000 tax year for Craig and Jennifer Van Patten; 32-B is a 2000 1040 tax return for Craig and Jennifer Van Patten for the 2000 tax year -- just a second here. That one, I think, was filed with an appeal. Anyway, it's 32-B.

And I think --

MR. STILLEY: Your Honor, we would have no objection to all those that he has stated for those to be admitted. I would like to approach. I think maybe we could expedite some other things even a little bit more.

THE COURT: All right.

(The following proceedings were had at the bench, out of the hearing of the jury.)

THE COURT: Is that the end of your offer?

MR. SNOKE: I'm getting there.

MR. STILLEY: I want to make my record up here.

THE COURT: Was that the end of your offer 32-B, or are there more?

MR. SNOKE: I've got more, but this is the end of the first batch.

MR. STILLEY: Your Honor, the reason I brought that up at this point in time is because I think that the other exhibits -- I know where he's going next, and I think that that relates to uncharged conduct, and I want to make an objection outside the jury.

THE COURT: Okay.

MR. SNOKE: I guess he's objecting in advance to some documents that Collins is going to be testifying to, the next witness that we're taking, in the search of the house, subject to a search warrant for which there's been no motion to suppress filed.

MR. STILLEY: Actually, no, Your Honor, it's Exhibit No. 58, which is a Mr. Dean document. So if you'll turn to 58, you'll see what I'm talking about.

MR. SNOKE: 58.

MR. STILLEY: It's Bob Dean.

MS. RADFORD: You mean the one that shows knowledge that he knew what he was doing?

MR. STILLEY: Well, it's uncharged conduct. They could have charged him with it, and didn't. And I just respectfully submit that this doesn't show anything about knowledge.

THE COURT: There's no offer yet on this. He's got

an offer that goes through 32-B.

MR. STILLEY: We stipulate to that admission. The only thing that we want to look at is No. 58 is a 2004 1040X tax return for Richard Blackstock. There's no charge on that.

THE COURT: Okay. When he offers that, we'll discuss it.

MR. SNOKE: I can offer those, what we've done to now. And if the Court wants to take this up after, we can do it.

THE COURT: Are there any other that are not objected to?

MR. SNOKE: I have Mr. Dean down to identify and talk about Exhibit 41, 42, 43, then we get to the series of 56 through 63, which is -- I think that's the ones he's objecting to, or are you just objecting to 58? You just said 58 a minute ago.

MR. STILLEY: I'm objecting to 58 through 63. And on these others -- Your Honor, I need to look at Exhibit 42 and 43 because I don't think that I'll object to those, but --

THE COURT: Okay.

MR. STILLEY: I do object to --

THE COURT: We'll take care of it.

MR. STILLEY: Your Honor, Exhibits 56 through 63 have to do with --

THE COURT: I don't want to hear it now.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT: Now, it's my understanding that these exhibits are to be admitted without objection, 14-A, 15, 15-A, 16, 16-A, 17, 17-A, 18, 18-A, 18-D, 19, 19-A, 20, 20-B, 20-D, 21, 21-A, 21-G, 22, 22-A, 23, 23-A, 24, 24-A, 25, 25-A, 25-C, 26, 26-A, 26-E, 27, 27-A, 27-C, 27-D, 27-E, 28, 28-A, 28-B, 28-E, 29, 29-A, 29-C, 30, 30-A, 31, 31-A, 32, 32-A, 32-B.

20-A, is that also one of them?

MR. SNOKE: 20-A should be, yes, Your Honor.

THE COURT: Very well.

MR. SNOKE: I failed to move in one other, which is 19-C, a 2001 Form 1040X for Franklin and Denise Warlick.

THE COURT: 19-C. Anything else?

MR. SNOKE: 19-C.

MR. STILLEY: Beg your pardon?

MR. SNOKE: 19-C.

MR. STILLEY: No objection to that.

THE COURT: Any objections to the ones that I've read off there?

MR. STILLEY: No, Your Honor.

THE COURT: Very well. Those will all be admitted.

MR. SNOKE: And 19-C; is that correct?

THE COURT: That's correct.

MR. SNOKE: All right.

Q. (By Mr. Snoke) Now, if you will look at exhibits -- start with Exhibit 41, please, sir. Can you tell us if you recognize Exhibit 41?

A. 41 is a 1040X for 2000 tax year for Richard Blackstock.

Q. I'm sorry. Strike that. I need you to look at --

MR. SNOKE: May I have a minute, Your Honor?

THE COURT: You may.

Q. (By Mr. Snoke) Mr. Dean, you talked about a substitute for return earlier.

A. Yes.

Q. Can you tell the Court and the jury what that is.

A. A substitute for a return is actually the start of a process where the Internal Revenue Service has received third-party information or other information as far as someone having income, but not having filed a tax return. The posting is made to the -- what we call the tax module for that specific year so that -- and at that time also a letter is mailed to the taxpayer to say this is the information we have showing that you have this income and this is the proposed tax.

The posting on their substitute for return does a couple of things. It creates that tax module, and it also puts other areas of the IRS on notice so in case a 1040X or a 1040 comes in for that taxpayer for that year, it would go what we call unpostful; it can't post to the account because of that substitute for return.

 That document that's sent in by the taxpayer will go to -- whether it's in examination or collection, for someone to look and see if the information on that substitute for return is valid. And if it is, then that information will be posted. Otherwise, if the IRS doesn't receive any information back from the taxpayer, there would be what we call a default adjustment made to the account to assess the amount of tax due that has been calculated.

So then it would go into a collection status from that point.

MR. SNOKE: I don't believe I have any other questions of this witness at this time.

THE COURT: Members of the jury, we'll break for the day. Please remember the Court's admonitions. You're not to discuss this case with anyone or allow anyone to discuss it with you. That means basically that we don't want you to have discussions about the case in the jury room with each other yet. And really the reason for that -- I'm not sure that there's a great reason for it, but the main reason is we don't want people to start making up their minds until the case has been fully presented. And we'd also -- you know, you have to deliberate as a group, so we can't have smaller groups breaking off and having discussions. Everything has to be from your collective wisdom and your collective memories.

I also don't want you to discuss the case with anyone at

your home. It's not so much what you would say, it's -- what I try to avoid is having someone else's opinions grafted onto yours. If you start a discussion, then someone is going to tell you what their opinion is or make some observations without having been here and without seeing the witnesses and without knowing anything really about the case. So I ask you just not to talk with anyone about the case, allow anyone to talk to you about the case.

You must not do any research or investigation on your own. And as I indicated, you have to keep an open mind until we get to the end of the case and you deliberate together.

I'll see you at 9:30 in the morning. Thank you.

(The following proceedings were had outside the presence of the jury.)

THE COURT: Be seated. Now let's get to the problems.

MR. SNOKE: Your Honor, the other exhibits that counsel was talking about, he mentioned 58, it's actually -- I believe would begin with 56 and go through -- well, 56 through 58 and then 61 through 63 cover certified accounts similar to what we've had in the A exhibits of the previous exhibits here. They're transcripts showing -- 56 is a transcript showing that Mr. Blackstock did not file any return for the time period from '89 through '98, that's a ten-year period, which was mentioned in our 404(b) -- one of our 404(b) things.

57 is a transcript of account for the '99 year showing that he did, in fact, show -- file a 1040X substitute -- a substitute return was filed for him. Then he filed a 1040X return for that year, which is part of our evidence in the case during the time period because he filed that in December of '02. He filed both a 1040X for the two 2000 and 2000 (sic) tax years.

Exhibit 58 is a 1040X tax return filed by Mr. Blackstock under this same theory, claim of right, for the 2000 tax year for himself, which he filed in December of 2002, the time period of our indictment.

Exhibit 59 is a transcript of account for Mr. Blackstock for the 2000 tax year. And then 60, beginning with 60, it's the 2001 account transcript for Mr. Blackstock showing he didn't file, but they filed a substitute for return for him.

61, a transcript of account for the 2002 tax year for Mr. Blackstock showing no filing for that year. And 62 and 63 are for the 2003 and 2004 tax years.

We believe that at least -- the fact that Mr. Blackstock is a nonfiler -- in fact, we would argue that he's actually -- there's evidence that he's more than that, actually a tax protestor, but he's certainly a nonfiler in the parlance of the Internal Revenue Service, and we've cited cases there, I think, that show that that nonfiling status is relevant on the willfulness issue.

And I'd cite the Court to the -- in addition to the case that we cited in our notice of res gestae and 404(b) -- some of this is res gestae because it happened during the time period of the indictment and he filed the exact same kind of claim of right tax returns for the '99 and 2000 tax years in December of 2002 that he was filing for everybody else that the Court has just seen evidence on in the previous exhibits -- a case of United States vs. Fingado, F-I-N-G-A-D-O, at 934 F.2d 1163, Tenth Circuit, 1991, I would suggest holds the proposition that evidence of defendant's failure to file in prior years was admissible on the issue of willfulness and good faith, both of which have been addressed in the opening remarks of the defendant. Of course, willfulness is an issue, one of the elements of the crime that we have charged him with in these 32 counts.

We would submit that Exhibit 57, 58 and 59 are all res gestae, they all occurred -- cover the period for the tax years in which he actually filed one of these 1040X forms for himself, and he filed them during the time period in the indictment.

The other exhibits, that would be 60 through 63 and Exhibit 56, covering the ten years before this time period, we would submit that those would be admissible under 404(b) to show his willfulness, his lack of -- his intent and knowledge and common scheme and plan as set forth in the 32 counts of the

indictment -- the superseding indictment.

THE COURT: Mr. Stilley.

MR. STILLEY: Your Honor, actually, as to the -- Your Honor, actually, the government has just about persuaded me that they would have a basis for entering these, the returns that were filed, but for the limited purpose of showing the state of mind of the defendant. I think if we had a limiting instruction on that, that those could be admitted.

And with respect to the failure to file, the issue that I see there is uncharged conduct that could be excessively prejudicial to the jury.

Now, I think that we've already taken this -- the PRA issue already seems to be proper before the -- for questioning before the jury based upon the Court's rulings, but if this -- if these prior failures to file are raised, it would seem that that would just make the PRA even more relevant to the discussion that it already is.

So with that said, I'll let the Court decide as to whether these need to be allowed in or not.

THE COURT: The exhibits, once the foundation is laid, I don't know whether you're going to want to agree to that or not, but the exhibits will be admitted as either res gestae or 404(b) and with an appropriate limiting instruction.

I want to hear some more about this PRA argument. I keep looking at these cases, and I'm still not sure exactly what

 your argument is.

MR. STILLEY: Okay, Judge, let me make a run at this then. I think one of the central issues that we've got here is that we've got a new PRA, whereas the government keeps on addressing the old PRA.

THE COURT: As does the IRS.

MR. STILLEY: Yes, the IRS does that. And I would respectfully that that --

THE COURT: There's that 11-year period that you've talked about, though, you haven't produced one case that indicates that there's a different interpretation out there.

MR. STILLEY: Well, actually, Your Honor, this is -- it probably would be helpful if I would supply another brief on this. Would the Court like me to supply another brief so I can just lay these things out?

THE COURT: That will be fine.

MR. STILLEY: Very well. And I know it seems like that there would be other cases like that. Really -- and maybe this is not what the Court is looking for, but I had a case in Peoria, Illinois just about a month or so ago, where that the PRA issue was raised and the government just dismissed the case with prejudice.

And I know that that is not, you know, Tenth Circuit case law or anything like that, but it does indicate pretty strongly in my mind -- and let me say this: The charges were willful

failure to file and tax evasion.

And also, the -- basically all we had presented as far as a defense was PRA. And that indicates to me that the government thinks it's a strong defense, otherwise, why would they dismiss? And they dismissed on a Friday before the Monday when the case was supposed to go to trial.

What I don't see is any case since 1995 that says that you can't use this. And before we get too far afield here, let me bring out some issues that help us build a case as to whether or not this is a valid defense.

The IRS has, as I think everybody will agree, put the same OMB number on the 1040 for about 25, 26 years. Now, it was either 2005 or 2006 -- and I can provide you with the correct information in a brief -- but the IRS then decided under pressure, there was pressure -- Your Honor, I filed a brief at the Tenth Circuit that was dismissed for other reasons -- I didn't file it, but I drafted it and there was another attorney that filed it, and these issues are looming large, and the government knows that these issues are looming large.

And in response to that, or at least in the face of that, the IRS decided that they would put the same OMB number on just a whole slew of tax forms, 1040X, the 1040, well, just about everything that's even -- even the 2555 foreign-earned income, they just slap the number on everything, which seems to me to be almost a concession that the IRS does not have their ducks

in a row.

If they're really going to contend that they can use one number to collect all this information, make changes every year, have no expiration date, not put the instruction on the form which is required by the law, and commit a whole host of other violations of the PRA, but somehow they still comply with the PRA, I'd like to hear how that they can say that. It does not make any sense. The IRS has taken upon itself to do things that are inconsistent with obedience to the law inconsistent with compliance.

If they had -- in response to arguments -- that there was a problem with the form, if they had backed up and made sure that all the information requested was supported by the statutes and by the Constitution, and put a form with an expiration number on it, then you would say, well, we're moving the right direction, the government is trying to obey the requirements that are out there. What you see is the opposite. You see them doing things that just don't make any sense at all.

Respectfully, I would submit that despite the fact that we don't have case law or -- now, when I say we don't have case law, I'm saying that there is a paucity of case law on the subject; however, I think that we're soon going to have the case law and the factors that I've been talking to you about are going to play very heavily in this.

 THE COURT: Let me ask you about this United States vs. Sasser, if you're familiar with it; if not, let me have you look at it over this evening. 974 F.2d 1544.

MR. STILLEY: What year was that?

THE COURT: It's a 1992 case. And the question I want to ask you after you've had a chance to look at it --

MR. STILLEY: That's out of the Tenth Circuit?

THE COURT: Yes.

-- is whether they -- and they have a failure to file versus filing falsely distinction. And whether or not that -- whether there's any reason that this distinction would not also apply to the 1995 version of the PRA.

MR. STILLEY: Absolutely, Your Honor. I can answer that easily. There's a Law Review article about this, about the new and more powerful PRA of 1995. And what really, really makes the change there -- and you can see it from this Internal Revenue bulletin. When you compare the Internal Revenue bulletin with the 3512 of the 1995 PRA, you'll see that the Internal Revenue bulletin says -- and I'm looking down at about the middle of the second paragraph. It says, "The public protection provision of the PRA provides that no person shall be subject to any penalty for failing to maintain or provide information to any agency if the information collection request involved does not display a current control number assigned by the Office of Management and Budget," OMB.

Now, I can agree with that as to the 1980 Act. And that's what they're talking about is the 1980 Act. But when you look at the 1995 Act, listen to this, under subsection (a), it says, "Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this chapter if..." -- and then they go on to say what the "if" involves.

But the operative words there are "a failure to comply." And what you have here is an allegation of a failure to comply. It's not a failure to fill out and submit the form; they're saying that the attempted compliance was inadequate or improper.

Now, before we go too far here, let's stop and think about the tools that the government has in their arsenal. They can file charges for tax evasion, filing a false return.

In this case, they have chosen 7206 -- 7206(2). And my reading of that statute is that the requirements there would fall under this provision that says you can't have a penalty for a failure to comply.

THE COURT: Okay. Anything else?

MR. STILLEY: I think that's all I've got. And I'll try to get you a brief on -- through the electronic filing system as quickly as I reasonably can.

THE COURT: Very well. Anything else, Mr. Snoke?

MR. SNOKE: Your Honor, I just wanted to inquire.

This last argument, is it based on these exhibits as to Mr. Blackstock's failure to file evidence that we were talking about here, or is he again talking about the motion to dismiss where we're not talking about Mr. Blackstock's failure to file, but the taxpayers' actual act of filing that we've just gone through all these exhibits on? I didn't understand exactly what the Court was --

THE COURT: I assume that it went back to the motion to dismiss.

MR. SNOKE: Again, then our argument hasn't really changed that -- on the motion to dismiss issue, Mr. Blackstock is not the aggrieved party to be complaining about violation of the Paperwork Reduction Act, if there was one. Of course, the very case that he cited to the Court, Dawes, he indicates that they didn't believe that Congress intended the IRS laws to be circumvented by the fact that the 1040 form may not have an OMB number on it.

But anyway, as I pointed out there to the Court before, what we have here is not a case in a 7206(1) where Mr. Blackstock is charged with failure to file, which I think that the Court will find most of these cases are that have been cited by defendant, nor is it a case where we have charged Mr. Ophoff for failure to file under 7206(1). It is a case under 7206(2), and we don't have a situation where we're charging somebody with failure to file.

These tax returns got filed. They got filed by these witnesses that the Court's about to hear. They got filed with the assistance of Mr. Blackstock, who filled them out in large part, if not wholly for the taxpayers.

THE COURT: That's why I asked counsel the question --

MR. SNOKE: It's a totally different issue -- I'm sorry.

THE COURT: That's why I asked the question of counsel about failure to file versus filing falsely.

MR. SNOKE: Right. And the government's argument is that it's --

THE COURT: You're not educating me. Okay. Thank you. See you in the morning.

REPORTER'S CERTIFICATE

I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

S/Terri Beeler
Terri Beeler, RMR
United States Court Reporter

# Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

## May 2000

## Reference Number: 2000-40-071

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

May 23, 2000

MEMORANDUM FOR COMMISSIONER ROSSOTTI

FROM: (for) Pamela J. Gardiner /s/ Margaret E. Begg

Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

This report presents the results of our review of the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. In summary, we found Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that the result of the cases and the damage amounts, if any, need to be captured in the Chief Counsel's management information system to allow systemic improvements that could prevent future violations of taxpayer privacy and rights.

As a result of this review, we recommend that the results of the cases and the damage amounts, if any, need to be captured in the management information system. In addition, a formal process should be established to refer lost and settled cases to either Treasury

Inspector General for Tax Administration for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any changes are necessary to protect taxpayer privacy and rights.

IRS management generally agreed with these recommendations for the need in improvements in Chief Counsel's management information system. Management's comments have been incorporated into the report where appropriate, and the full text of their comments is included as an appendix.

Copies of this report are also being sent to the IRS managers who are affected by the report recommendations. Please contact me at (202) 622-6510 if you have questions, or your staff may call Walter E. Arrison, Associate Inspector General for Audit, (Wage and Investment Income Programs), at (770) 986-5720.

## Table of Contents

Executive Summary

Objective and Scope

Background

Results

The Chief Counsel's Management Information System Needs to Capture Additional Data Elements

Conclusion

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Additional Information Regarding Civil Cases

Appendix V – Management's Response to the Draft Report

## Executive Summary

There are several matters in which a taxpayer can file a civil complaint against the Internal Revenue Service (IRS). These include violations of the Privacy Act and a Freedom of Information Act appeal. In addition, certain sections of the Internal Revenue Code (I.R.C.) allow taxpayers to file civil complaints for damages against the United States Government for conduct or lack of conduct on the part of IRS personnel.

The IRS Restructuring and Reform Act of 1998 (RRA 98) placed emphasis on policies and procedures protecting taxpayer privacy and rights. Therefore, the IRS needs to be aware of how current policy and procedure affect taxpayer confidentiality.

The overall objective of this review was to determine the effectiveness of the IRS' controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. See Appendix IV for additional information regarding the types of civil complaints that can be filed involving the IRS.

## Results

The Office of the Chief Counsel uses a fully integrated, nationwide management information system to control and monitor its workload. Various data elements are captured within the management information system, allowing for case and issue tracking. Additionally, the system is regularly updated to reflect the status of and the amount of time that was charged to the case. There were approximately 46,000 civil cases closed in the Office of the Chief Counsel management information system during the period January 1, 1998, through September 30, 1999. We found the IRS Office of the Chief Counsel management information system adequate to control the inventory of civil cases. However, we believe that additional data elements need to be captured to allow systemic improvements that could prevent future violations of taxpayer privacy and rights.

### The Chief Counsel's Management Information System Needs to Capture Additional Data Elements

The Office of the Chief Counsel is not consistently capturing the necessary elements in its management information system to ensure the IRS takes appropriate action to protect future taxpayer privacy and rights. The results of the cases and damage amounts, if any, need to be captured to allow the IRS to assess policies and procedures which protect taxpayer confidentiality and ensure equitable treatment of taxpayers.

The Office of the Chief Counsel officials indicated that case disposition is not always captured in the management information system because there is no regulation or policy which requires this type of information, and they do not have a use for this data. Additionally, the Department of Justice (DOJ)

represents the Government for the cases alleging violation of the I.R.C., and the Office of the Chief Counsel is not always informed of the outcome of these cases. When received in the Office of the Chief Counsel, I.R.C. §7431 complaints are forwarded to the Treasury Inspector General for Tax Administration (TIGTA) for research on any open investigation on employees cited in the complaint. However, no further referrals are made to the TIGTA after the cases are closed for possible criminal investigation. The Office of the Chief Counsel also works with IRS management to obtain necessary information to develop a defense strategy. However, no formal process is in place for cases that are lost or settled, to ensure the IRS reviews and makes the appropriate changes to established policies and procedures. We believe the IRS needs to be aware of all outcomes for these cases and damage amounts, if any, need to be captured in the Office of the Chief Counsel's management information system. The lost and settled cases need to be analyzed to determine if systemic improvements are needed to better protect future taxpayer privacy and rights.

## Summary of Recommendations

The IRS Office of the Chief Counsel should obtain from the DOJ all results of civil cases involving IRS employees and capture results in the management information system. The lost and settled cases should be referred to the TIGTA for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

Management's Response: The Chief Counsel will modify the management information system to provide additional fields for entry of information regarding the ultimate outcome in all the various types of cases and adopt formal procedures requiring personnel to request information regarding case outcomes. Further, the Chief Counsel will adopt formal procedures requiring the appropriate IRS functional management to be notified of the outcome of every case.

In addition, Chief Counsel attorneys will notify IRS functional management of Treasury Department standards governing referrals to TIGTA and provide a recommendation, if appropriate.

## Objective and Scope

The overall objective of this review was to determine the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS.

The audit was performed because the Senate Finance Committee had concerns regarding the process of controlling and monitoring these cases. As a result, the Treasury Inspector General for Tax Administration (TIGTA) initiated this review. The audit work was conducted during the period September 1999 through November 1999, at the IRS Chief Counsel offices in Washington, DC. The audit work was performed in accordance with *Government Auditing Standards*.

Details of our audit objective, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

There are several matters in which a taxpayer can file a civil complaint against the IRS. These include violations of the Privacy Act and a Freedom of Information Act appeal. In addition, certain sections of the Internal Revenue Code (I.R.C.) allow taxpayers to file civil complaints for damages against the Government for conduct or lack of conduct on the part of IRS personnel. (See Appendix IV for additional information regarding the types of civil complaints that can be filed involving the IRS.)

The IRS Restructuring and Reform Act of 1998 (RRA 98) placed emphasis on policies and procedures protecting taxpayer privacy and rights. RRA 98 §3802 requires the Joint Committee on Taxation to conduct a study on provisions regarding taxpayer confidentiality. The study is to include an examination of present-law protections of taxpayer privacy.

The Office of the Chief Counsel's responsibility differs depending upon the reason for the complaint. The Office of the Chief Counsel is responsible for presenting and defending the Government's position for Tax Court cases. However, the Department of Justice (DOJ) is responsible for defending the other civil cases involving the IRS, including all actions alleging violation of the I.R.C. For these cases, the Office of the Chief Counsel is responsible only for providing assistance to the DOJ on possible defense strategies.

## Results

The Office of the Chief Counsel uses a fully integrated, nationwide management information system to control and monitor its workload. This system automates the full range of litigation, technical rulings, and administrative management functions of the Office of the Chief Counsel.

Various data elements are captured within the management information system, allowing for case and issue tracking. Additionally, the system is regularly updated to reflect the status of and the amount of time that was charged to the case.

There were approximately 46,000 civil cases closed in the Office of the Chief Counsel's management information system during the period January 1, 1998, through September 30, 1999. We found the IRS Office of the Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that additional data elements need to be captured identifying the results of these cases. Trend analyses could be performed allowing the IRS to assess operations to determine if policies and procedures are effectively protecting taxpayer privacy and rights.

### The Chief Counsel's Management Information System Needs to Capture Additional Data

**Elements**

The Office of the Chief Counsel is not consistently capturing the necessary elements in its management information system to ensure the IRS takes appropriate action to protect future taxpayer rights. The results of the cases and damage amounts, if any, need to be captured to allow the IRS to assess policies and procedures which protect taxpayer confidentiality and ensure equitable treatment of taxpayers.

When a complaint is received by the Office of the Chief Counsel, various data elements are entered into the management information system, including the name of the case, an opening date, and the type of case. When the case is completed, a closed date is entered and the status is changed to closed. In some instances, an explanation of the outcome of the case (i.e., the case was dismissed, won, settled, or lost) is also entered. However, this is not a requirement, nor is it consistently captured.

The Office of the Chief Counsel officials indicated that closed case disposition is not always captured in the management information system because there is no regulation or policy which requires this type of information, and they do not have a use for this data. Additionally, the DOJ represents the Government for the cases alleging violation of the I.R.C., and the Office of the Chief Counsel is not always informed of the outcome of these cases.

I.R.C. §7431, Improper Disclosure of Returns and Return Information, states that a person may sue for civil damages if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any tax return or tax return information with respect to the taxpayer in violation of any provision of I.R.C. §6103.

When received in the Office of the Chief Counsel, I.R.C. §7431 complaints are forwarded to the TIGTA for research on any open investigations on employees cited in the complaint. However, no further referrals are made to the TIGTA after the cases are closed, for possible criminal investigation.

In cases which are lost or settled, the potential exists that an IRS employee has performed a criminal violation. Therefore, once a case is closed, the lost or settled cases should be referred to the TIGTA for possible investigation.

Additionally, the Office of the Chief Counsel works with IRS management to obtain necessary information to develop a defense strategy. However, no formal process is in place for cases that are lost or settled, to ensure the IRS reviews and makes the appropriate changes to established policies and procedures.

For example, one I.R.C. §7431 complaint against the IRS was settled for improper access to the taxpayer's information and disclosure of the tax return information to a third party. The settlement resulted in the taxpayer receiving over $41,000 for damages and fees. We did not find any indications that this case was subsequently reviewed after it was settled to determine if systemic changes were needed in IRS policies or procedures.

The passing of the RRA 98 placed emphasis on policies and procedures protecting taxpayer privacy and rights. We believe the IRS needs to be aware of all outcomes for civil complaints involving IRS employees. The lost and settled cases would be analyzed to determine the appropriate course of action to prevent future violations of taxpayer privacy and rights.

## Recommendations

1. The Office of the Chief Counsel should obtain all results of civil cases involving IRS employees from the DOJ. The results of all cases should be captured in the Office of the Chief Counsel's management information system to allow for the ready identification of any lost or settled cases.

   Management's Response: The Chief Counsel will modify the management information system to provide additional fields for entry of information regarding the ultimate outcome in all the various types of cases discussed in the report. However, the IRS and the Office of Chief Counsel are in the midst of a massive organizational restructuring as well as a major effort to upgrade our basic technology infrastructure. Computer programming efforts that are directly related to the current tax-filing season, to implementation of new tax laws, and to these major modernization efforts must be given priority over all other projects.

   The Chief Counsel will adopt formal procedures requiring personnel who are responsible for monitoring these cases to request information regarding case outcomes. While this practice has been followed informally in some offices, the Chief Counsel agrees it should be required uniformly.

2. The Office of the Chief Counsel should establish a formal process to refer lost and settled cases either to the TIGTA for criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

Management's Response: The Chief Counsel will adopt formal procedures requiring the appropriate IRS functional management be notified of the outcome of every case of this type including cases that the government wins or settles on a favorable basis as well as those that result in a loss or settlement adverse to the government's position.

In addition, Chief Counsel attorneys will be instructed also to advise management of the Treasury Department standards governing referrals to TIGTA at the time IRS functional management is informed of the results of the case, and provide a recommendation as to whether such a referral is appropriate in light of the outcome of the case.

## Conclusion

We found the Office of the Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that the results of the cases and the damage amounts, if any, need to be captured in the management information system. Additionally, a formal process should be established to refer lost and settled cases to either TIGTA for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

## Appendix I

Detailed Objective, Scope, and Methodology

The overall objective of this review was to determine the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. To accomplish our objective, we:

I. Assessed the process for controlling and monitoring settlement cases and identified any lack of controls and/or control weaknesses.

   A. Identified all possible civil cases that could be filed against the Government involving the IRS. Identified approximately 46,000 civil cases closed during the period January 1, 1998, through September 30, 1999.
   B. Identified and reviewed the IRS policies and procedures regarding these cases and determined how settlement cases are processed.
   C. Reviewed seven Internal Revenue Code (I.R.C.) §7431 case files which were included on the Department of Justice's (DOJ) list of settlement cases for the period of January 1, 1998, through August 31, 1999, and determined whether appropriate documentation existed to identify case disposition.
   D. Interviewed Office of the Chief Counsel employees and identified the process used to track and monitor civil cases taxpayers filed involving the IRS.

I. Evaluated the IRS management information system used to control civil cases involving settlements against the IRS for accuracy, completeness, and usefulness.

   A. Reviewed input sheets and documentation regarding database categories for the Office of the Chief Counsel's management information system and determined the type of information that was maintained.
   B. Obtained from the DOJ a report of cases involving settlements for the period January 1,1998, through August 31,1999, and compared to information obtained from the Office of Chief Counsel management information system and determined whether it was complete.
   C. Traced the seven I.R.C. §7431 cases listed on the DOJ's list of settlement cases the IRS case files and determined the accuracy of the IRS records.

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

D. Interviewed Office of Chief Counsel employees and determined the process for entering data into the management information system, uses of the system, and the type of information maintained.

## Appendix II

## Major Contributors to This Report

Walter E. Arrison, Associate Inspector General for Audit (Wage and Investment Income Programs)

Michael Phillips, Director

Debbie Gregory, Audit Manager

Patricia Lee, Audit Manager

Kent Johnson, Senior Auditor

Frank Jones, Senior Auditor

John O'Rourke, Senior Auditor

Thomas Dori, Auditor

Bobbie Draudt, Auditor

Peter Stoughton, Auditor

## Appendix III

## Report Distribution List

Deputy Commissioner Operations C:DO

Office of the Chief Counsel CC

Assistant Chief Counsel (Disclosure Litigation) CC:EL:D

Assistant Chief Counsel (General Litigation) CC:EL:GL

National Director for Legislative Affairs CL:LA

Office of Management Controls M:CFO:A:M

Director, Office of Program Evaluation and Risk Analysis M:O

Office of the National Taxpayer Advocate C:TA

## Appendix IV

Additional Information Regarding Civil Cases

There are several matters in which a taxpayer can file a civil complaint that involves the Internal Revenue Service (IRS). These include violations of the following:

- Privacy Act. The Privacy Act not only allows individuals to obtain their own records, it also gives the individual the right to correct, amend, or delete information that is inaccurate, irrelevant, outdated, or incomplete.
- Freedom of Information Act (FOIA). The FOIA creates procedures whereby any member of the public may obtain the records of the agencies of the Government.
- Internal Revenue Code (I.R.C.) §7422 (Civil Actions for Refund). A taxpayer can file a suit for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected.
- I.R.C. §7426 (Civil Actions by Persons Other Than Taxpayers). Persons other than the taxpayer whose property is wrongfully levied upon to satisfy another taxpayer's liability may bring a civil action against the United States.
- I.R.C. §7431 (Improper Disclosure of Returns and Return Information). A person may sue for civil damages if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to the taxpayer in violation of any provision of I.R.C. § 6103.
- I.R.C. §7432 (Civil Damages for Failure to Release Lien). A taxpayer may bring a civil action for damages against the United States if any officer or employee of the IRS knowingly, or by reason of negligence, fails to release a lien under I.R.C. §6325 on property of the taxpayer.
- I.R.C. §7433 (Civil Damages for Certain Unauthorized Collection Actions). This section permits a taxpayer to recover civil damages arising from an IRS officer's or employee's negligent disregard of any provision of the I.R.C. or the Department of the Treasury regulations in connection with the collection of federal tax from the taxpayer.
- I.R.C. §7435 (Civil Damages for Unauthorized Enticement of Information Disclosure). A taxpayer may sue for civil damages if any officer or employee of the United States intentionally compromises the determination or collection of any tax due from an attorney, certified public accountant, or enrolled agent representing the taxpayer in exchange for

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

information conveyed by the taxpayer to the attorney, certified public accountant, or enrolled agent for purposes of obtaining advice concerning the taxpayer's tax liability.

## Appendix V

Management's Response to the Draft Report

The response was removed due to its size. To see the complete response, please see the Adobe PDF version of the report on the TIGTA Public Web Page.

# Management Advisory Report: No Violations of the Fair Debt Collection Practices Act Resulted in Administrative or Civil Actions (Fiscal Year 2001)

## July 2001

## Reference Number: 2001-10-081

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

July 24, 2001

MEMORANDUM FOR DEPUTY COMMISSIONER CHIEF COUNSEL

FROM: Pamela J. Gardiner /s/ Pamela J. Gardiner

Deputy Inspector General for Audit

SUBJECT: Final Management Advisory Report - No Violations of the Fair Debt Collection Practices Act Resulted in Administrative or Civil Actions (Fiscal Year 2001)

This report presents the results of our Fiscal Year 2001 Fair Debt Collection Practices Act (FDCPA) review. In summary, we found no violations of the FDCPA reported by Internal Revenue Service (IRS) management that resulted in an administrative action against an employee. Additionally, there were no civil actions that resulted in the IRS paying monetary settlements to taxpayers because of an FDCPA violation.

IRS management agreed with the observations in the draft report. The full text of their comments is included as an appendix.

Copies of this report are also being sent to the IRS managers who are affected by the report. Please contact me at (202) 622-6510 if you have any questions or Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

## Table of Contents

Executive Summary

Objective and Scope

Background

Results

No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Conclusion

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Management's Response to the Draft Report

## Executive Summary

The Fair Debt Collection Practices Act (FDCPA) includes provisions that restrict various collection abuses and harassment in the private sector that did not apply to the United States (U.S.) Government at the time the FDCPA was enacted. However, the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to comply with certain provisions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers. In addition, taxpayers who believe their FDCPA rights were violated can file a civil action against the U.S. Government under the Civil Damages for Certain Unauthorized Collection Actions statute.

Section 1102 (d)(1)(G) of the RRA 98 requires the Treasury Inspector General for Tax Administration (TIGTA) to include in one of its semiannual reports to the Congress information regarding any administrative or civil actions related to FDCPA violations. The semiannual report must provide a summary of such taxpayer actions and include any judgments or awards granted. Accordingly, the

objective of this review was to obtain information on IRS administrative and civil actions resulting from violations of the FDCPA by IRS employees. The TIGTA reviewed cases coded as FDCPA violations on IRS computer systems opened after July 22, 1998, and closed during the period April 1 through December 31, 2000.

## Results

Based on a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee. In addition, the IRS did not have any closed civil actions involving FDCPA violations. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

### No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

To determine if any FDCPA violations resulted in an administrative action, the TIGTA reviewed cases coded as FDCPA violations on the Automated Labor and Employee Relations Tracking System. Review of all 28 cases coded as FDCPA during the audit period did not identify any FDCPA violations that resulted in an administrative action being taken against an IRS employee. These 28 cases were either miscoded as FDCPA violations (19) or closed without administrative action (9).

### No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Civil actions filed by taxpayers against the IRS are input to the Counsel Automated System Environment (CASE) for tracking. During the audit period, the CASE did not contain any closed civil actions coded as FDCPA. As a result, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations during the period of this review.

Case information from the Department of Justice's (DOJ) Tax Division was obtained to better ensure civil actions involving FDCPA violations were captured on the CASE. Because the DOJ does not track FDCPA violations separately, the TIGTA reviewed the cases filed under Civil Damages for Certain Unauthorized Collection Actions, which allows taxpayers to sue the IRS for violations of the Internal Revenue Code related to collection actions. Seven cases were opened on or after July 22, 1998, and closed during the period April 1 through December 31, 2000. None of the seven cases involved FDCPA violations.

Management's Response: IRS management agreed with the observations in the draft report. Management's complete response to the draft report is included as Appendix IV.

## Objective and Scope

The objective of this review was to obtain information on Internal Revenue Service (IRS) administrative and civil actions resulting from violations of the Fair Debt Collection Practices Act (FDCPA) by IRS employees. Fieldwork was performed in the Strategic Human Resources, Agency-Wide Shared Services, and Chief Counsel functions in the National Headquarters during the period February to March 2001. This review was performed in accordance with the President's Council on Integrity and Efficiency's *Quality Standards for Inspections*.

For this Fiscal Year (FY) 2001 review, closed cases from the Automated Labor and Employee Relations Tracking System (ALERTS) and the Counsel Automated System Environment (CASE) were analyzed to identify violations of the FDCPA. However, the Treasury Inspector General for Tax Administration (TIGTA) cannot ensure that cases recorded on the ALERTS encompass all potential FDCPA violations. As stated in a FY 2000 report on the FDCPA, data captured on the ALERTS related to potential FDCPA violations may not be complete and accurate. During this FY 2001 review, the TIGTA did not determine the accuracy or consistency of disciplinary actions taken against employees for potential FDCPA violations.

Details of our objective, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

Section 1102 (d)(1)(G) of the IRS Restructuring and Reform Act of 1998 (RRA 98) requires the TIGTA to include in one of its semiannual reports to the Congress information regarding any administrative or civil actions related to FDCPA violations. The semiannual report must provide a summary of such taxpayer actions and include any judgments or awards granted.

The IRS' definition of administrative action includes disciplinary actions ranging from admonishment through removal. Lesser actions, such as oral or written counseling, are not considered administrative actions. The IRS' definition of administrative actions was used when determining the number of FDCPA violations to be reported to the Congress.

The FDCPA includes provisions that restrict various collection abuses and harassment in the private sector that did not apply to the federal government at the time the FDCPA was enacted. The RRA 98 requires the IRS to comply with certain provisions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers. Specifically, the IRS may not communicate with taxpayers in connection with the collection of any unpaid tax:

- At unusual or inconvenient times.
- If the IRS knows that the taxpayer has obtained representation from a person authorized to practice before the IRS, and the IRS knows or can easily obtain the representative's name and address.
- At the taxpayer's place of employment, if the IRS knows or has reason to know that such

communication is prohibited.

Further, the IRS may not harass, oppress, or abuse any person in connection with any tax collection activity or engage in any activity that would naturally lead to harassment, oppression, or abuse. Such conduct specifically includes (but is not limited to) the use or threat of violence or harm, use of obscene or profane language, causing a telephone to ring continuously with harassing intent, and the placement of telephone calls without meaningful disclosure of the caller's identity.

If taxpayers believe the IRS has violated their FDCPA rights, they may file an administrative claim for damages with the applicable IRS executive for the location where the taxpayer resides or file for civil damages in a federal district court.

Taxpayer complaints about IRS employees' conduct can be reported to several IRS functions for tracking on management information systems. If a taxpayer files a civil action or if IRS management determines that the taxpayer's FDCPA rights were potentially violated, the complaint could be referred and tracked on one or both of the following IRS systems:

- Office of Workforce Relations' ALERTS, which generally tracks employee behavior that may warrant IRS management administrative actions.
- Chief Counsel's CASE, which is an inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

The IRS implemented FDCPA codes on the ALERTS in March 1999 and on the CASE in June 1999.

## Results

Based upon a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee for the period April 1 through December 31, 2000. In addition, the IRS did not have any closed civil actions involving FDCPA violations for this period. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

### No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

IRS managers investigate a taxpayer complaint against an employee and coordinate with the local Labor Relations office to determine the appropriate level of disciplinary action. If the misconduct requires an administrative action, managers refer the complaint to the local Labor Relations office, which tracks it on the ALERTS. The following categories were established on the ALERTS to track potential FDCPA violations:

- Contact with a taxpayer at an unusual location or time.

- Direct contact with a taxpayer without the consent of the taxpayer's representative.
- Contact with a taxpayer at his or her place of employment when prohibited.
- Conduct which is intended to harass or abuse a taxpayer.
- Use of obscene or profane language toward a taxpayer.
- Continuous telephone calls to a taxpayer with the intent to harass.
- Telephone calls to a taxpayer without meaningful disclosure of the employee's identity.

To determine if any FDCPA violations resulted in an administrative action, the TIGTA reviewed cases from the ALERTS coded as potential FDCPA violations that were opened after July 22, 1998, and closed during the period April 1 through December 31, 2000. Review of all 28 cases coded as FDCPA violations did not identify any FDCPA violations that resulted in an administrative action being taken against an employee.

Nineteen of the 28 cases reviewed from the ALERTS were incorrectly coded as FDCPA violations. The other nine cases were closed without administrative action. The TIGTA previously identified miscoding of FDCPA cases on the ALERTS and made a recommendation to address this issue in a FY 2000 report on the FDCPA. IRS management agreed to take corrective actions to better ensure FDCPA violations are properly identified and reported.

## No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Civil actions filed by taxpayers against the IRS are input to the CASE database by District Counsel, who are responsible for coding the case with the appropriate category code.

For cases opened after July 22, 1998, and closed during the period April 1 through December 31, 2000, the CASE did not include any closed civil actions coded as FDCPA. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations during the period of this review.

Case information from the Department of Justice's (DOJ) Tax Division was obtained to better ensure civil actions involving FDCPA violations were captured on the CASE. Because the DOJ does not track FDCPA violations separately, the TIGTA reviewed the cases filed under Civil Damages for Certain Unauthorized Collection Actions, which allows taxpayers to sue the IRS for violations of the Internal Revenue Code related to collection actions. Seven cases were initiated on or after July 22, 1998, and closed during the period April 1 through December 31, 2000. None of the seven cases involved FDCPA violations.

Management's Response: IRS management in the Office of the Chief Counsel and the Workforce Relations Division in Strategic Human Resources considered the report to be accurate and complete and were in agreement with its findings.

## Conclusion

Based upon a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee for the period April 1 through December 31, 2000. In addition, the IRS did not have any closed civil actions involving FDCPA violations for this period. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

**Appendix I**

Detailed Objective, Scope, and Methodology

The objective of this review was to obtain information on Internal Revenue Service (IRS) administrative and civil actions resulting from violations of the Fair Debt Collection Practices Act (FDCPA) by IRS employees. Specifically, we:

I. Determined the number of FDCPA violations resulting in administrative actions.
   - A. Obtained a computer extract from the Automated Labor and Employee Relations Tracking System (ALERTS) of 28 cases that were opened after July 22, 1998, and closed during the period April 1 through December 31, 2000, coded as FDCPA violations.
     1. Analyzed available ALERTS information to ensure the cases were accurately coded as FDCPA violations.
     2. Obtained additional case file information from the local Labor Relations offices to determine if cases were coded accurately as FDCPA violations.
   - B. Determined if any cases involving FDCPA violations resulted in an administrative action.
     1. Reviewed the final disposition code for the cases involving FDCPA violations.
     2. Determined if any cases resulted in a minimum disciplinary action of admonishment.
     3. Reviewed case file information from the local Labor Relations offices, if necessary, to determine if the violations occurred after July 22, 1998.

II. Determined if there were any IRS civil actions (judgments and awards granted) resulting from violations of the FDCPA.
   - A. Requested a computer extract from the Counsel Automated System Environment (CASE) for Subcategory 511 (established to track FDCPA violations) cases opened after July 22, 1998, and closed during the period April 1 through December 31, 2000. (Note: No cases met our criteria for review.)
   - B. Requested copies from the Department of Justice's Tax Division of any complaints opened on or after July 22, 1998, involving any Internal Revenue Code § 7433 civil action and closed during the period April 1 through December 31, 2000.

**Appendix II**

## Major Contributors to This Report

Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)

Nancy A. Nakamura, Director

Jeffrey M. Jones, Audit Manager

Mark Judson, Senior Auditor

Margaret A. Anketell, Auditor

**Appendix III**

## Report Distribution List

Commissioner N:C

Chief, Agency-Wide Shared Services A

Associate Chief Counsel (Procedure and Administration) CC:P&A

Director, Office of Workforce Relations N:ADC:H:R

Director, Personnel Services A:PS

Director, Strategic Human Resources N:ADC:H

Chief Counsel CC

Director, Legislative Affairs CL:LA

Director, Office of Program Evaluation and Risk Analysis N:ADC:R:O

National Taxpayer Advocate TA

Office of Management Controls N:CFO:F:M

Audit Liaisons:

Chief, Agency-Wide Shared Services A

Chief Counsel CC

Associate Chief Counsel (Procedure and Administration) CC:P&A

Director, Office of Workforce Relations N:ADC:H:R

Director, Strategic Human Resources N:ADC:H

**Appendix IV**

Management's Response to the Draft Report

The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

# Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

## September 2001

## Reference Number: 2001-10-188

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

September 26, 2001

MEMORANDUM FOR DIRECTOR, COMMISSIONER'S

COMPLAINT PROCESSING AND ANALYSIS GROUP

DEPUTY INSPECTOR GENERAL FOR INVESTIGATIONS,

TREASURY INSPECTOR GENERAL FOR TAX

ADMINISTRATION

FROM: Pamela J. Gardiner /s/ Pamela J. Gardiner

Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

This report presents the results of our review and recommendations regarding Section (§) 1203 complaints. The objectives of this review were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) § 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA), and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress.

In summary, at the time of our review, management could not locate 9 of 173 sampled RRA 98 § 1203 complaints, and management information systems did not contain current information for 22 of the 173 sampled § 1203 complaints. After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the management information system based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress. Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

We recommended that IRS and TIGTA Office of Investigations management locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located, correct the status for the remaining § 1203 complaints where the information was not current, develop a process to better control § 1203 complaints, and ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

IRS and TIGTA Office of Investigations management agreed with these recommendations. Their comments have been incorporated into the report where appropriate, and the full text of their comments is included as Appendices VI and VII, respectively.

Copies of this report are also being sent to the IRS managers who are affected by the report recommendations. Please contact me at (202) 622-6510 if you have questions or John R. Wright, Acting Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

## Table of Contents

Executive Summary

Objectives and Scope

Background

Results

Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

Conclusion

Appendix I – Detailed Objectives, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Provisions Requiring Termination of Employment

Appendix VI – Internal Revenue Service Commissioner's Complaint Processing and Analysis Group's Response to the Draft Report

Appendix VII – Treasury Inspector General for Tax Administration Office of Investigations' Response to the Draft Report

## Executive Summary

The Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 provides the IRS Commissioner with the authority to terminate the employment of IRS employees for certain proven violations committed in connection with the performance of official duties. The IRS Commissioner also has the authority to determine whether mitigating factors exist that weigh against termination. One example of an RRA 98 § 1203 violation is the willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's property. Employees may appeal the charges of § 1203 misconduct throughout the administrative process. However, once all appeals have been exhausted and the IRS Commissioner makes a final decision that an employee committed one of the § 1203 provisions, the final decision cannot be appealed and the employee is removed from Federal service, as required by the RRA 98. RRA 98 § 1102(a) added Internal Revenue Code § 7803(d)(1)(E) (Supp. IV 1998) to require the Treasury Inspector General for Tax Administration (TIGTA) to annually report to the Congress any termination or mitigation under RRA 98 § 1203.

The objectives of this audit were to determine if RRA 98 § 1203 complaints were properly controlled by the IRS and the TIGTA and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress.

## Results

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. In general, complaints referred from one office to another within the TIGTA Office of Investigations, or from one office to another within the IRS, were accounted for and arrived at their final destination. However, at the time of our review, management could not locate 9 of the 173 complaints in our sample, and management information systems did not contain current information for 22 of the 173 complaints in the sample. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the Investigations Management Information System (IMIS) based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress. Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

### Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

For 31 of the 173 complaints in our sample, either the complaints could not be located from information recorded on the computer databases (9 complaints) or the computer databases did not contain current information about the complaints (22 complaints). We projected our findings to the total population of 1,213 open § 1203 complaints on the IRS and TIGTA databases as of September 30, 2000. According to the projection, casework may not have been completed for an estimated 38 complaints (± 1.93 percent) and the computer databases may not contain current information for another 125 complaints (± 4.23 percent). After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints.

### Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

We compared § 1203 complaint information reported in the FY 2000 TIGTA Semiannual Reports to the Congress to § 1203 complaint documentation obtained from the IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) and from the TIGTA Complaint Management Division. Two required § 1203 items were reported incorrectly in one FY 2000 Semiannual Report and five items not required to be reported were overstated in two FY 2000 Semiannual Reports.

## Summary of Recommendations

We recommend that IRS CCPAG and TIGTA Office of Investigations management locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located, correct the computer databases for those § 1203 complaints where the information was not current, ensure compliance with existing procedures for processing § 1203 complaints, devise a method to ensure § 1203 complaints can be located in the future, and ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

Management's Response: IRS CCPAG and TIGTA Office of Investigations management agreed with the observations and recommendations in the report. Both offices took immediate action to resolve the remaining complaints we could not locate and to correct the computer databases where the information was not current. In addition, controls will be strengthened to ensure compliance with existing procedures for processing § 1203 complaints and to ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

IRS and TIGTA management's complete responses to the draft report are included as Appendices VI and VII, respectively.

## Objectives and Scope

The overall objectives of this audit were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA) and if § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress. Audit work was performed in the IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) and the TIGTA Office of Investigations' Complaint Management Division (CMD). The audit was conducted between December 2000 and April 2001 and was performed in accordance with *Government Auditing Standards.*

To accomplish the objectives, we:

- Interviewed IRS CCPAG and TIGTA CMD personnel to determine how complaints are received, controlled, tracked, and eventually reported in the TIGTA Semiannual Report to the Congress.
- Reviewed a statistically valid sample of 173 open § 1203 complaints from the IRS and the TIGTA Office of Investigations databases as of September 30, 2000, to determine if the complaints were properly controlled.
- Reviewed documentation from the IRS CCPAG and the TIGTA CMD to determine the accuracy of the § 1203 complaint information reported in the TIGTA Semiannual Reports to the Congress for the 6-month periods ending March 31, 2000, and September 30, 2000.

Details of the audit objectives, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

On July 22, 1998, the President signed the RRA 98 into law. RRA 98 § 1102(a) added Internal Revenue Code (I.R.C.) § 7803(d)(1)(E) (Supp. IV 1998) to require the TIGTA to annually report to the Congress any termination or mitigation under RRA 98 § 1203. Section 1203 provides the IRS Commissioner with the authority to terminate the employment of IRS employees for certain proven violations committed in connection with the performance of their official duties. The IRS Commissioner also has the authority to determine whether mitigating factors exist that weigh against termination. One example of an RRA 98 § 1203 violation is the willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's property.

IRS employees and taxpayers may submit § 1203 complaints through e-mail, regular mail, telephone, or fax to any office within the IRS or the TIGTA Office of Investigations. Once received, § 1203 complaints may be investigated by either the IRS or the TIGTA Office of Investigations. In most instances, the TIGTA is given the opportunity to review a § 1203 complaint to decide who should conduct the investigation. The following explains the types of § 1203 complaints investigated by the IRS and the TIGTA.

**Complaints that must be referred to the TIGTA**

With the exception of potential Equal Employment Opportunity-related complaints and tax-related issues, the following complaints are referred directly and immediately to the TIGTA Office of Investigations:

- Section 1203 complaints related to all managers, Senior Executive Service, Criminal Investigation, or GS-15 employees.
- Section 1203 complaints related to false statements under oath, falsification of documents, assault or battery, confidentiality and disclosure of return information, or threat of audit.

**Complaints that may be referred to the TIGTA**

Based on preliminary investigation by the IRS, complaints related to the remaining § 1203 provisions may be referred to the TIGTA Office of Investigations, as follows:

- Section 1203 complaints related to seizures, constitutional rights, or harassment/retaliation, if IRS management determines that a potential § 1203 violation exists and threshold criteria have been met.
- Section 1203 complaints related to discrimination (civil rights), if IRS management determines that a potential § 1203 violation exists and specific criteria have been met.
- Section 1203 complaints related to late filing or the understatement of tax liability, if IRS management determines that a potential § 1203 violation exists and the facts indicate a potential criminal violation.

If the TIGTA Office of Investigations declines to conduct an investigation, the complaint is referred to the IRS through the CCPAG. The IRS Commissioner established the CCPAG to enhance the IRS' responsiveness to employee and taxpayer complaints. In October 1999, the CCPAG began receiving and controlling all § 1203 complaints referred from the TIGTA to the IRS.

**Evaluation of § 1203 Complaints**

Once the facts are established through an inquiry or investigation, IRS managers, with the assistance of local labor relations specialists and the staff of the Centralized Adjudication Unit (CAU), evaluate the information to determine if a § 1203 violation has occurred. If there is sufficient evidence to support that a § 1203 violation occurred, the employee is given a letter advising that the IRS proposes to remove him or her from Federal service. The employee has a right to respond to this letter orally or in writing. After the employee responds to the letter, a deciding IRS management official determines if the evidence supports the § 1203 violation charge. This factual determination may be reviewed through arbitration or the employee may appeal the charge of § 1203 misconduct to the Merit Systems Protection Board. If the employee's appeal is not successful and the § 1203 violation remains supported, the case is forwarded to the Commissioner's § 1203 Review Board for evaluation.

The Commissioner's § 1203 Review Board evaluates all cases where there is enough evidence to support the § 1203 violation charge and recommends a disciplinary action (either termination or mitigation) for each case. The Review Board only forwards a § 1203 case to the IRS Commissioner if it determines that the Commissioner should consider mitigation. If the Review Board determines that the Commissioner should not consider mitigation, the case is returned to the deciding IRS management official and the employee is removed from Federal service under the authority of the Commissioner, as required by the RRA 98.

Employees have the same rights to appeal a removal action as they did before the enactment of the RRA 98 and may appeal the charges of § 1203 misconduct throughout the administrative process. However, once the IRS Commissioner makes a final judicial or administrative determination that an employee committed one of the § 1203 provisions, the final decision cannot be appealed and the employee is removed from Federal service, as required by the RRA 98.

During the time period covered by our review, the TIGTA Office of Investigations used the Investigations Management Information System (IMIS) to control and track § 1203 complaints. If a complaint involves allegations against more than one IRS employee, the TIGTA tracks each employee as a separate allegation. The IRS uses two computer systems, the Automated Labor and Employee Relations Tracking System (ALERTS) and the Executive Correspondence Management System (ECMS), to control and track § 1203 complaints.

When the RRA 98 became law on July 22, 1998, the IRS and the TIGTA Office of Investigations began developing procedures for the processing of § 1203 complaints. As with any new process, many procedures changed during the beginning stages as each organization determined the best way to jointly

handle these complaints. As a result, the processes and systems for controlling § 1203 complaints evolved as both the IRS and the TIGTA gained experience in implementing the law.

## Results

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. In general, complaints referred from one office to another within the TIGTA Office of Investigations, or from one office to another within the IRS, were accounted for and arrived at their final destination.

However, at the time of our review, management could not locate 9 of the 173 complaints in our sample, and management information systems did not contain current information for 22 of the 173 complaints in the sample. After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the IMIS based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress.

Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

### Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

For 31 of the 173 complaints in our sample, either the complaints could not be located from information recorded on the computer databases (9 complaints) or the computer databases did not contain current information about the complaints (22 complaints). We projected our findings to the total population of 1,213 open § 1203 complaints on the IRS and the TIGTA databases as of September 30, 2000. According to the projection, casework may not have been completed for an estimated 38 complaints (± 1.93 percent) and the computer databases may not contain current information for another 125 complaints (± 4.23 percent).

In addition to reviewing the sample of complaints, we analyzed the IMIS and identified 28 allegations where the § 1203 violation code had been removed from the system, which resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress.

#### Transfers were not properly controlled for nine complaints

At the time of our review, neither the IRS nor the TIGTA Office of Investigations could locate 9 of the 173 complaints (5 percent) reviewed. Seven of the nine complaints that could not be located were transferred from the TIGTA Office of Investigations to the IRS. As a result, we could not determine if the IRS had completed its investigation for these complaints.

- Five complaints were referred to the IRS according to the IMIS, but neither the IRS nor the TIGTA Office of Investigations could provide us with a copy of the required transmittal form, Complaint Referral Memorandum - Response Required (Form 2070), during the time of our review.
- One complaint was referred using Form 2070, but the TIGTA Office of Investigations did not have a receipted copy of the Form 2070 to show that the complaint reached its final destination. The TIGTA Office of Investigations had referred the complaint to a former IRS Regional Commissioner's office before the CCPAG was established.
- One complaint was referred using Form 2070 and the TIGTA Office of Investigations had a receipted Form 2070, indicating that the CCPAG received the complaint. However, the complaint was not controlled on the ALERTS, which indicates that the complaint may not have been worked.

The two remaining complaints that could not be located were transferred from the CAU to a field Labor Relations office. However, the field Labor Relations offices had no record of receiving the complaints.

Transmittal forms are generally used to help ensure that management maintains control of the documents as they are transferred from one office to another. Use of a transmittal form generally requires the receiving official to acknowledge receipt of the document by sending a signed copy of the form back to the originator. The TIGTA Office of Investigations requires the use of Form 2070 as a transmittal form when transferring complaints.

IRS management does not require the use of a document transmittal when transferring complaints within the IRS. Instead, a cover letter is attached to the complaint and the computer database is updated to show the complaint was transferred. However, with this method of transfer, there is no follow-up to ensure the employee receives the complaint.

One complicating factor that increases the difficulty of tracking complaints as they are transferred between the IRS and the TIGTA Office of Investigations is the lack of a uniform complaint numbering system to identify complaints in both offices that are recorded on different computer systems. Because the IRS and the TIGTA computer systems were not designed to be integrated with each other, each uses a different numbering system to identify complaints. Without a common field to link the computer systems, complaints that are transferred between the IRS and the TIGTA Office of Investigations cannot be systemically tracked between the two organizations.

If § 1203 complaints are not properly controlled, the administrative action required by law may not be taken by the IRS Commissioner. Uncontrolled complaints could also result in § 1203 information being

understated in the TIGTA Semiannual Report to the Congress. Additionally, if all actions are not completed on complaints, employees may not have the opportunity to be proven innocent.

**Computer information was not current for 22 complaints**

Information contained on the IRS and the TIGTA computer systems was not current for 22 of the 173 complaints (13 percent) in our sample at the time of our review. Generally, for these 22 complaints, the IMIS, the ALERTS, or the ECMS databases either had not been updated to show the most current work on the case or the information had been entered incorrectly. For example, the IMIS database indicated that ten complaints had been referred to the IRS for action, although the IRS had completed action on the complaints and closed them on its databases. For two other complaints, the IMIS database showed the complaints had been sent to the CMD when they had actually been referred to the IRS for action.

The IRS and the TIGTA Office of Investigations rely on accurate management information to document the location of complaints and to report § 1203 information. Complaints are entered onto computer inventory systems when received, and IRS and TIGTA employees are responsible for updating their respective computer systems whenever complaints are referred from one office to another or when the status of a complaint changes. If information is not updated when the status of a complaint changes (i.e., open, closed, referred), the accuracy of the TIGTA Semiannual Report to the Congress could be affected.

**Computer information was not consistent for 28 allegations**

The general § 1203 information reported in the semiannual report relies on accurate § 1203 violation code information. However, a comparison of the September 2000 IMIS data with the March 2000 IMIS data identified 28 allegations that were originally coded as § 1203 violations in March, but were no longer coded as § 1203 violations in September. The TIGTA enters all § 1203 allegations received into the IMIS; however, prior to June 2000, TIGTA employees sometimes removed the § 1203 violation code if the allegation did not meet specific § 1203 criteria. We could not determine when the § 1203 violation code for the 28 allegations had been removed, prior to June 2000 or after.

The TIGTA Office of Investigations added procedures in June 2000 to require the retention of the § 1203 violation code on the IMIS as originally entered. For example, the TIGTA uses the § 1203 violation code to determine the number of allegations received involving potential § 1203 violations. However, if the initial investigation shows the charge of § 1203 misconduct is not supported, the TIGTA does not remove the § 1203 violation code from the IMIS. Instead, the TIGTA continues to show the complaint as an *allegation* of § 1203 misconduct on the IMIS and updates the complaint record with the appropriate closing code to show the allegation was not supported.

Consistent treatment of the § 1203 violation code is important because this code is used in reporting information in the TIGTA Semiannual Report to the Congress. Removing the § 1203 violation code from an allegation on the IMIS reduces the total number of allegations received involving potential § 1203 violations reported in the semiannual report. As a result, information was inconsistently reported

in the TIGTA Semiannual Report to the Congress.

## Recommendations

1. IRS CCPAG and TIGTA Office of Investigations management should locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located and should correct the status for the remaining § 1203 complaints where the information was not current.

   Management's Response: CCPAG and TIGTA Investigations management have either found, or recreated and resolved the remaining complaints that could not be located. They have also updated the remaining complaints where status information was not current.

2. IRS CCPAG and TIGTA Office of Investigations management should develop a process to better control § 1203 complaints. The process should include:

- Using a transmittal form to transfer complaints between the IRS and the TIGTA.
- Acknowledging receipt (via transmittal form) of the complaint by the receiving office (for complaints transferred between the IRS and the TIGTA).
- Following up with the receiving office if receipt of the complaint is not acknowledged (for complaints transferred between the IRS and the TIGTA).
- Following up with the receiving office to ensure the complaint was received (for complaints transferred within the IRS).
- Updating the complaint status on all relevant computer databases when complaints are transferred or closed.
- Exploring the feasibility of capturing a unique complaint number on the IRS and TIGTA databases.

Management's Response: The CCPAG management processes have evolved and they now have an electronic system in place to control the transfer of complaints within the IRS and a manual system to control the transfer of complaints outside the IRS. Both systems provide a verification of receipt, a trail of actions, and a means to follow-up to ensure complaints are not lost. Information is exchanged with the TIGTA Office of Investigations to show actions taken on complaints. Also, the CCPAG decided the use of a common complaint number was not feasible without a common information system.

The TIGTA Office of Investigations has a manual process in place to control the transfer of complaints. Special Agents in Charge (SAC) will be advised, via memorandum, of their responsibilities to verify receipt of any § 1203 complaints forwarded to the IRS. Also, the SACs and the CMD will be advised of the importance of current and accurate information on their management information systems. In addition, a field is available to capture an IRS complaint number, if applicable.

1. TIGTA Office of Investigations management should develop a consistent method for identifying

the number of § 1203 allegations received for reporting in the TIGTA Semiannual Report to the Congress.

Management's Response: Notification will be provided to TIGTA Office of Investigations personnel that once a § 1203 complaint is entered into the management information system, the violation code will only be removed if management has determined the code was placed there in error.

## Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

We compared § 1203 complaint information reported in the FY 2000 TIGTA Semiannual Reports to the Congress to § 1203 complaint documentation obtained from the IRS CCPAG and the TIGTA CMD. Two required items were reported incorrectly in one FY 2000 semiannual report and five items not required to be reported were overstated in two FY 2000 semiannual reports.

The following chart summarizes the § 1203 information reported in the FY 2000 TIGTA Semiannual Reports to the Congress. The information on terminations and mitigated cases is required by the RRA 98; the other information is not required, but represents the actions taken on the § 1203 allegations received by the TIGTA.

### Reported Versus Actual § 1203 Information

| | Reported | Actual | Overstated/ (Understated) |
|---|---|---|---|
| **April FY 2000 Semiannual Report** | | | |
| Information Required By RRA 98: | | | |
| Terminations | 11 | 11 | 0 |
| Mitigated Cases | 0 | 0 | 0 |
| Other General Information: | | | |
| § 1203 Allegations Received | 369 | 369 | 0 |
| § 1203 Investigations Initiated | 89 | 78 | 11 |
| Open § 1203 Investigations | 65 | 56 | 9 |

| | | | |
|---|---|---|---|
| Closed § 1203 Investigations | 24 | 22 | 2 |
| § 1203 Complaints Referred to the IRS | 213 | 199 | 14 |
| **October FY 2000 Semiannual Report** | | | |
| Information Required By RRA 98: | | | |
| Terminations | 15 | 17 | (2) |
| Mitigated Cases | 1 | 2 | (1) |
| Other General Information: | | | |
| § 1203 Allegations Received | 257 | 251 | 6 |
| § 1203 Investigations Initiated | 164 | 164 | 0 |
| Open § 1203 Investigations | 132 | 132 | 0 |
| Closed § 1203 Investigations | 32 | 32 | 0 |
| § 1203 Complaints Referred to the IRS | 108 | 108 | 0 |

*Source: FY 2000 TIGTA Semiannual Reports to the Congress, TIGTA's IMIS database, and documentation from the CCPAG.*

**The numbers of § 1203 terminations and mitigated cases were not always accurately reported by the IRS**

We identified all § 1203 cases evaluated by the Commissioner's § 1203 Review Board during FY 2000 and compared the final disciplinary actions recommended by the Review Board (termination or mitigation) with CCPAG Outreach and Policy Support information and with the ALERTS computer data to determine the accuracy of the number of terminations and mitigated cases reported in the FY 2000 TIGTA Semiannual Reports to the Congress. The IRS is responsible for accurately reporting the number of terminations and mitigated cases to the TIGTA for inclusion in the TIGTA Semiannual Report to the Congress.

Based upon incorrect information provided by the IRS, the TIGTA reported 15 terminations and 1 mitigated case in its Semiannual Report to the Congress for the 6-month period ending September 30,

2000. However, there were actually 17 terminations and 2 mitigated cases recorded on the IRS computer systems for this period. I.R.C. § 7803(d)(1)(E) (Supp. IV 1998) requires the TIGTA to annually report to the Congress all terminations or mitigated cases under RRA 98 § 1203.

The IRS tracks all personnel actions on the ALERTS; however, at the time the data was gathered for the semiannual report, the CCPAG Outreach and Policy Support staff did not have direct access to the ALERTS. Instead, the CCPAG staff relied on a "data call" to determine the total number of terminations and mitigated cases to report to the TIGTA Office of Investigations, but did not have access to the computer data to ensure that the numbers were correct and complete. In January 2001, the CCPAG Outreach and Policy Support function was given direct access to this computer data and became solely responsible for tracking the number of terminations and mitigated cases under § 1203. This should prevent the problem from recurring.

**General § 1203 information was not always accurately reported by the Office of Investigations**

In addition to reporting the required information on terminations and mitigated cases under § 1203 in its Semiannual Report to the Congress, the TIGTA Office of Investigations also includes general § 1203 information, such as the number of § 1203 allegations received by the TIGTA and the number of § 1203 investigations initiated.

However, five § 1203 items not required to be reported were overstated in two FY 2000 TIGTA Semiannual Reports to the Congress. These overstatements could have been prevented if the § 1203 information had been independently verified prior to issuance of the semiannual reports, in accordance with internal guidelines.

For example, for the 6-month period ending

March 30, 2000, the number of § 1203 investigations initiated was overstated by 11 and the number of § 1203 complaints referred to the IRS was overstated by 14. The inaccuracies for this reporting period occurred because the TIGTA CMD staff who consolidated the § 1203 information did not always use the correct criteria in their calculations.

For the 6-month period ending September 30, 2000, the TIGTA overstated the number of § 1203 allegations received by six. This overstatement occurred because the CMD staff calculated the number of § 1203 allegations received for the entire fiscal year and then subtracted the number of § 1203 allegations reported in the previous 6-month period. This methodology should have worked; however, the § 1203 violation code had been changed for several of the § 1203 allegations reported in the previous 6-month period.

**Reported information did not include the results of all § 1203 complaints**

The type of information on § 1203 complaints presented in the TIGTA Semiannual Report to the

Congress complies with the RRA 98 requirements. In addition, the TIGTA Office of Investigations includes general § 1203 information that is not required by the law.

We identified several other types of information that might be useful in presenting a more complete picture of the results of § 1203 complaints, such as the number of:

- Employees under investigation who chose to resign or retire in lieu of termination under § 1203.
- Employees whose removal (termination) during their probationary period was due to a § 1203 violation.
- Employees whose charge of § 1203 misconduct, and subsequent termination, was reversed through an appeal.
- Section 1203 complaints received and investigated within the IRS that do not require TIGTA investigation.

Although this information is not required, it would provide a more complete picture of actions resulting from § 1203 complaints. For example, from July 22, 1998, (the date the RRA 98 was enacted) through March 31, 2001, there were 41 terminations under § 1203. However, there were 93 additional employees during this same period that resigned or retired after § 1203 administrative procedures were initiated. The 93 resignations or retirements were not reported in any TIGTA Semiannual Report to the Congress.

## Recommendations

4. TIGTA CMD management should ensure that the general § 1203 information is verified before it is included in the TIGTA Semiannual Report to the Congress.

   Management's Response: Standard criteria have been developed to extract § 1203 information. In addition, an independent review of the information will be conducted prior to its release.

5. The TIGTA Office of Investigations should consider reporting in the Semiannual Report to the Congress the number of employees who retire or resign in lieu of termination under § 1203, the number of employees who are removed during their probationary period due to a § 1203 violation, the number of employees whose charge of § 1203 misconduct (and subsequent termination) is reversed through an appeal, and the number of § 1203 complaints received and investigated within the IRS that do not require TIGTA investigation.

Until the number of § 1203 complaints received and investigated within the IRS (not requiring TIGTA investigation) can be included in the semiannual report, TIGTA Office of Investigations management should clarify that the § 1203 numbers reported in the TIGTA Semiannual Report to the Congress do not depict the results of all § 1203 violations.

Management's Response: TIGTA Office of Investigations management will consider reporting this information in future Semiannual Reports.

## Conclusion

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. Due to the sensitivity of § 1203 complaints, improvements should be made to ensure that § 1203 complaints are properly controlled when transferred between offices, that complaint information on computer databases is current, and that § 1203 information is verified before being included in the TIGTA Semiannual Report to the Congress.

## Appendix I

### Detailed Objectives, Scope, and Methodology

The overall objectives of this audit were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA) and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress. We performed the following work:

I. Determined if § 1203 complaints were properly controlled by the IRS and the TIGTA Office of Investigations.
   A. Interviewed IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) personnel to determine how complaints are received, controlled, and tracked. Performed a walk-through of the CCPAG and prepared a flowchart of the process.
   B. Interviewed TIGTA Complaint Management Division (CMD) personnel to determine how complaints are received, controlled, and tracked. Performed a walk-through of the CMD and prepared a flowchart of the process.
   C. Obtained an extract of the TIGTA Investigations Management Information System (IMIS) as of September 30, 2000, and requested all § 1203 records from the IRS' Automated Labor and Employee Relations Tracking System (ALERTS) and the Executive Correspondence Management System (ECMS) as of September 30, 2000. Identified 211 § 1203 complaints on the IMIS in the status "referred to the IRS" and 36 § 1203 complaints on the ALERTS or the ECMS in the status "referred to the TIGTA" as of September 30, 2000.
   D. Identified 321 open § 1203 complaints on the IMIS and 645 open § 1203 complaints on the ALERTS or the ECMS that were in a "non-referred" status as of September 30, 2000.
   E. Selected a statistically valid sample of 70 open § 1203 complaints from the population identified in Step I.C. that were referred either from the IRS to the TIGTA Office of Investigations (10 complaints) or from the TIGTA Office of Investigations to the IRS (60 complaints). Located the complaints and obtained copies of the complaint history documentation. Based the sample selection criteria on the following criteria:

| Referred | Total | IMIS | ALERTS | ECMS |
|---|---|---|---|---|
| Population | 247 | 211 | 12 | 24 |
| Precision | 10 % | | | |
| Error Rate | 50% | | | |
| Confidence Level | 95% | | | |
| Sample Size | 70 | 60 | 3 | 7 |

Our precision and error rates were larger in the referred sample than in the non-referred sample (Step I.F.) because, in our opinion, complaints transferred between offices had a higher risk of not being controlled than complaints that were not transferred. We used an expected error rate of 50 percent to provide the largest potential sample. We used a 10 percent precision rate because if we found uncontrolled complaints, the precision of the sample would be immaterial.

F. Selected a statistically valid sample of 103 open § 1203 complaints from the population identified in Step I.D. that were in a "non-referred" status on the IRS systems (69 complaints) or the TIGTA system (34 complaints). Located the complaints and obtained copies of the complaint history documentation. Based the sample selection criteria on the following criteria:

| Non-referred | Total | IMIS | ALERTS | ECMS |
|---|---|---|---|---|
| Population | 966 | 321 | 418 | 227 |
| Precision | 4% | | | |
| Error Rate | 5% | | | |
| Confidence Level | 95% | | | |
| Sample Size | 103 | 34 | 45 | 24 |

II. Determined if § 1203 complaint information was accurately reported in the Fiscal Year (FY) 2000 TIGTA Semiannual Reports to the Congress.

A. Interviewed appropriate CCPAG and CMD personnel to determine:

1. The process for compiling and reporting the required information on terminations

or mitigated cases under § 1203.

2. The process for compiling and reporting information regarding TIGTA § 1203 complaint investigations.

B. Identified all § 1203 cases reviewed by the Commissioner's 1203 Review Board for FY 2000 and determined if the disciplinary actions (termination or mitigation) taken on these cases were reflected in the respective TIGTA Semiannual Report to the Congress.

C. Determined the accuracy of the general § 1203 information reported in the FY 2000 TIGTA Semiannual Reports to the Congress.

D. Identified all complaints that were coded as § 1203 on the March 2000 IMIS database but were not coded as § 1203 on the September 2000 IMIS database.

**Appendix II**

## Major Contributors to This Report

Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)

Nancy A. Nakamura, Director

Gerald T. Hawkins, Audit Manager

Catherine E. Cloudt, Senior Auditor

Nelva U. Blassingame, Auditor

Yolanda D. Brown, Auditor

Andrew J. Burns, Auditor

**Appendix III**

## Report Distribution List

Commissioner N:C

Assistant Deputy Commissioner N:ADC

Chief, Agency-Wide Shared Services A

Commissioner, Large and Mid-Size Business Division LM

Commissioner, Small Business/Self-Employed Division S

Commissioner, Tax Exempt and Government Entities Division T

Commissioner, Wage and Investment Division W

Chief Counsel CC

Director, Legislative Affairs CL:LA

Director, Office of Program Evaluation and Risk Analysis N:ADC:R:O

National Taxpayer Advocate TA

Office of Management Controls N:CFO:F:M

Audit Liaisons:

Commissioner's Complaint Processing & Analysis Group N:ADC:C

Chief, Agency-Wide Shared Services A:W

**Appendix IV**

Outcome Measures

This appendix presents detailed information on the measurable impact that our recommended corrective actions will have on tax administration. These benefits will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Reliability of Information:

    Actual – 28 allegations for which computer information was not consistent (see page 7).

    Potential – 38 complaints (± 1.93 percent) where casework may not have been completed and another 125 complaints (± 4.23 percent) where the computer databases may not contain current information (see page 7).

Methodology Used to Measure the Reported Benefit:

**Actual** - We compared the March 2000 Treasury Inspector General for Tax Administration (TIGTA) Investigations Management Information System (IMIS) to the September 2000 TIGTA IMIS and identified 28 allegations that were coded as Section (§) 1203 violations in March, but were no longer coded as § 1203 violations in September. The § 1203 violation code had been removed from the system for these 28 allegations.

**Potential** - We obtained an extract of the TIGTA IMIS and requested all § 1203 records from the Internal Revenue Service's (IRS) Automated Labor and Employee Relations Tracking System and the Executive Correspondence Management System as of September 30, 2000. From these data extracts, we identified 1,213 open § 1203 complaints on the IRS and TIGTA databases as of September 30, 2000. We stratified the § 1203 complaint population into two sub-populations: complaints that were in a referred status and complaints that were not in a referred status.

We randomly selected a statistically valid sample of 173 complaints from the 2 sub-populations. Details of our methodology are presented in Appendix I. The following chart summarizes the population sizes, sample sizes, and the numbers of exceptions (errors) found in each sample.

| | | | Exceptions | |
|---|---|---|---|---|
| **Sub-population** | **Population Size** | **Sample Size** | **Complaints that Could Not Be Located** | **Complaints with Incorrect Status** |
| Referred complaints | 247 | 70 | 8 | 14 |
| Non-referred complaints | 966 | 103 | 1 | 8 |
| Totals | 1,213 | 173 | 9 | 22 |

To proportionately weight the results from each sample, we divided each sub-population of complaints (referred and non-referred) by the total population of complaints, as follows.

247 referred complaints / 1,213 total complaints = 0.2036

966 non-referred complaints / 1,213 total complaints = 0.7964

For each exception category (complaints that could not be located and complaints with incorrect status), we calculated the estimated percent of error in the total population, as follows:

**Complaints that could not be located**

- Calculated the error rate within each sub-population by dividing the number of complaints that could not be located in each sample by the total number of complaints in that sample.

  8 complaints could not be located / 70 referred complaints sampled = 0.1143

  1 complaint could not be located / 103 non-referred complaints sampled = 0.0097

- Multiplied the error rate from each sub-population by its weighted proportion to the total population and added the results.

  (0.2036 * 0.1143) + (0.7964 * 0.0097) = 0.0310034726

  0.0310034726 = 3.1 percent error in total population

- Multiplied the total population by the percent of error.

  1,213 * 3.1 percent = 38 complaints that could not be located.

  Lower and Upper Limits

- Calculated the lower limit of the error rate.

  0.0310034726-NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((8/70)*(62/70)/69)+966^2*((966-103)/966)*((1/103)*(102/103)/102))) = 0.0117004877

- Calculated the upper limit of the error rate.

  0.0310034726+NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((8/70)*(62/70)/69)+966^2*((966-103)/966)*((1/103)*(102/103)/102))) = 0.0503064574

- Calculated the difference between the error rate in the total population and the lower and upper limits of error.

  Lower limit: 0.0117004877 – 0.0310034726 = -0.0193029848 (negative 1.93 percent)

  Upper limit: 0.0503064574 – 0.0310034726 = 0.0193029848 (positive 1.93 percent)

**Complaints with incorrect status**

- Calculated the error rate within each sub-population by dividing the number of instances where the computer databases did not contain current information in each sample by the total number of complaints in that sample.

  14 complaints with incorrect status / 70 referred complaints sampled = 0.2000

  8 complaints with incorrect status / 103 non-referred complaints sampled = 0.0777

- Multiplied the error rate from each sub-population by its weighted proportion to the total population and added the results.

  (0.2036 * 0.2000) + (0.7964 * 0.0777) = 0.1025796589

  0.1025796589 = 10.26 percent error in total population

- Multiplied the total population by the percent of error.

  1,213 * 10.26 percent = 125 complaints where the computer databases may not contain current information.

  Lower and Upper Limits

- Calculated the lower limit of the error rate.

  0.1025796589–NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((14/70)*(56/70)/69)+966^2*((966-103)/966)*((8/103)*(95/103)/102))) = 0.0602323072

- Calculated the upper limit of the error rate.

  0.1025796589+NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((14/70)*(56/70)/69)+966^2*((966-103)/966)*((8/103)*(95/103)/102))) = 0.1449270105

- Calculated the difference between the error rate in the total population and the lower and upper limits of error.

  Lower limit: 0.0602323072 – 0.1025796589 = -0.0423473517 (negative 4.23 percent)

Upper limit: 0.1449270105 – 0.1025796589 = 0.0423473517 (positive 4.23 percent)

## Appendix V

Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Provisions Requiring Termination of Employment

The Internal Revenue Service (IRS) must terminate the employment of an IRS employee (absent direct intervention by the IRS Commissioner) if there is a final administrative or judicial determination that, in the course of his or her official duties, the employee committed one of the following provisions:

**§ 1203(b)(1)** Willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's home, personal belongings, or business assets.

**§ 1203(b)(2)** Providing false statements under oath with respect to a material matter involving a taxpayer or taxpayer representative.

**§ 1203(b)(3)** With respect to a taxpayer, taxpayer representative, or other employee of the IRS, the violation of:

A. Any right under the Constitution of the United States; or
B. Any civil right established under:
   i. Title VI or VII of the Civil Rights Act of 1964,
   ii. Title IX of the Education Amendments of 1972,
   iii. The Age Discrimination in Employment Act of 1967,
   iv. The Age Discrimination Act of 1975,
   v. Section 501 or 504 of the Rehabilitation Act of 1973, or
   vi. Title I of the Americans with Disabilities Act of 1990.

**§ 1203(b)(4)** Falsifying or destroying documents to conceal mistakes made by any employee with respect to a matter involving a taxpayer or taxpayer representative.

**§ 1203(b)(5)** Assault or battery on a taxpayer, taxpayer representative, or other employee of the IRS, but only if there is a criminal conviction, or a final adverse judgment by a court in a civil case, with respect to the assault or battery.

**§ 1203(b)(6)** Violations of the Internal Revenue Code (I.R.C.) of 1986, Department of Treasury regulations, or policies of the IRS

(including the Internal Revenue Manual) for the purpose of retaliating against, or harassing, a taxpayer, taxpayer representative, or other employee of the IRS.

**§ 1203(b)(7)** Willful misuse of the provisions of § 6103 of the I.R.C. of 1986 for the purpose of concealing information from a Congressional inquiry.

**§ 1203(b)(8)** Willful failure to file any tax return required under the I. R.C. of 1986 on or before the date prescribed therefore (including any extensions), unless such failure is due to reasonable cause and not to willful neglect.

**§ 1203(b)(9)** Willful understatement of Federal tax liability, unless such understatement is due to reasonable cause and not willful neglect.

**§ 1203(b)(10)** Threatening to audit a taxpayer for the purpose of extracting personal gain or benefit.

**Appendix VI**

## Internal Revenue Service Commissioner's Complaint Processing & Analysis Group's Response to the Draft Report

The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

**Appendix VII**

## Treasury Inspector General for Tax Administration Office of Investigations' Response to the Draft Report

The response was removed due to its size. To see the complete response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

Case 1:06-cv-01226-JDB Document 13-2 Filed 04/09/2007 Page 114 of 151

# JOINT HEARING BEFORE THE COMMITTEES OF THE

# UNITED STATES SENATE

# AND

# UNITED STATES HOUSE OF REPRESENTATIVES

# MAY 20, 2003

## "The Strategic Plans and Budget of the IRS"

## STATEMENT FOR THE RECORD

## Pamela J. Gardiner

accounts in the IRS' modernization plan. CADE will consist of databases and related applications that will include processes for daily posting, settlement, refund processing, and issue detection for taxpayer account and return data.

The CADE databases and related applications will also enable the implementation of other modernized systems that will improve customer service and compliance and allow the on-line posting and updating of taxpayer account and return data. The portion of the CADE related to individual tax accounts will be incrementally deployed in five releases, each related to a specific taxpayer segment, over several years.

| | RELEASE ONE | RELEASE TWO | RELEASE THREE | RELEASE FOUR | RELEASE FIVE |
|---|---|---|---|---|---|
| **Tax Return Types** | 1040EZ | 1040EZ<br>1040A<br>1040 (without Sch. C,E,F) | 1040EZ<br>1040A<br>1040 (without Sch. C,E,F) | 1040 with Sch. C,E, F,<br>94X [1]<br>720 [2] | All remaining individual tax returns |
| **Filing Status** | Single | All (Single, Married, Head of Household) | All | All | All |
| **Account Characteristics** | Refund or even balance<br>No open account issues | Refund or even balance<br>No open account issues | Full paid, refund or balance due<br>No open account issues | Full paid, refund or balance due<br>No open account issues | All accounts not included in previous releases |
| **Est. Returns** [3] | 6 Million | 29 Million | 41 Million | 34 Million | 12 Million |
| **Est. Delivery** | | | | | |
| **As of April 2000** | January 2002 | August 2002 | July 2003 | July 2004 | July 2005 |
| **As of March 2001** | January 2002 | January 2003 | January 2004 | January 2005 | January 2006 |
| **As of April 2003** | August 2003 | January 2005 | TBD | TBD | TBD |

The IRS and its contractor (PRIME) have made progress in delivering the CADE project by building a substantial portion of Release I and creating a comprehensive foundation for all five releases. However, the contractor's development of the CADE project has experienced significant delays and increased costs. As shown in the previous table, the Release 1 deployment date is now estimated to be August 2003, which is about 20 months behind its planned delivery date.

The IRS and PRIME contractor initially estimated that Release 1 could be delivered for approximately $51.9 million, an estimate that was revised 6 months later to $64.6 million. The IRS and PRIME contractor have agreed to cap the Release 1 development costs at $54.5 million. Project delays can be attributed to underestimating the complexity of this effort and difficulties in identifying and managing the project requirements. Specifically, these difficulties occurred in developing the balancing, control, and reconciliation process; comprehensive documentation for the CADE Computer Operations Handbook; computer system naming standards, and testing

activities.

As a result of delays in deploying the CADE, approximately 35 million taxpayers did not receive the benefits of faster tax return processing, and thus faster refunds, during the 2002 and 2003 Filing Seasons. In addition, the modernization projects that will provide improved customer service and compliance activities will be delayed because they are dependent upon CADE. Based on current schedules, these customer service and compliance improvement projects will not be deployed until at least Fiscal Year (FY) 2006 or later. Delays in these projects will have the following adverse effects on the IRS and taxpayers:

- The time it takes the IRS to initiate a compliance contact with a taxpayer will not be reduced.

- The IRS' ability to offer one-stop service to taxpayers by allowing Customer Service Representatives to identify all issues a taxpayer might have with the IRS when a contact is initiated will be delayed.

- The IRS' ability to answer taxpayer account-related questions with timely and complete data will be limited.

Customer Service

RRA 98 mandated that IRS be more responsive to customer needs. To refocus its emphasis on helping taxpayers understand and meet their tax responsibilities, the IRS revised its mission statement. The IRS has made some progress in enhancing its customer service activities. For example, taxpayers have several options from which to choose when they need assistance from the IRS in answering tax law questions. These options include walk-in service at nationwide Taxpayer Assistance Centers (TAC) and toll-free telephone assistance.

During this calendar year, TIGTA assessed the service provided by representatives at the TACs and through the Toll-Free Telephone System. Overall, the IRS has made improvements in providing service to the taxpaying public. For example, during January through April 2003, IRS employees correctly answered 25 percent more questions, provided 19 percent fewer incorrect answers, and referred 87 percent fewer taxpayers to publications than for this same period last year.

During our review of the TACs, TIGTA personnel visited 72 centers and posed 283 questions to IRS representatives. Results of our review are synopsized in the following chart:

| | ***Number of Responses*** | ***Percentage*** |
|---|---|---|

| | | |
|---|---|---|
| Correct Answers | 199 | 70 |
| Incorrect Answers | 73 | 26 |
| No Answer Provided – Referred to Publication In Lieu of a Response | 8 | 3 |
| Other | 3 | 1 |

In January 2003, TIGTA also began assessing whether IRS employees were adhering to operating guidelines by referring the tax law questions we asked, which were outside the scope of services they have been trained to answer. The auditors asked 157 "out of scope" questions and determined that employees did not follow referral procedures for 105 (67 percent) of these questions.

The IRS' accuracy in responding to taxpayers' questions using the IRS' Toll-Free Telephone System was somewhat better than that at the TACs. Between January 27 and March 13, 2003, our reviewers performed on-line monitoring of 259 taxpayers calls and determined that IRS representatives correctly answered the taxpayers' questions in 71 percent of the cases.

Filing Season

The tax return filing season impacts every American taxpayer and is, therefore, always a highly critical program for the IRS. In addition to providing customer service to American taxpayers, the IRS must coordinate tax law changes, programs, activities, and resources to effectively plan and manage each filing season.

Overall, the 2003 Filing Season has gone well and tax returns are being processed timely. Based on TIGTA's review, it appears that the IRS should complete processing of individual returns on schedule with all tax refunds being timely issued within the required 45 days from the filing season closing date of April 15. IRS data show that, as of May 9, 2003, over 52 million electronic returns had been received. The official projection for total electronic returns is 54.3 million. Electronic returns have increased by 12 percent from this time last year. In addition, over 69 million paper returns had been received. The official projection for total paper returns is 78 million. Paper returns have decreased by 8 percent from this time last year.

Many new and significant tax law provisions affected taxpayers' Tax Year (TY) 2002 individual income tax returns, including two *Economic Growth and Tax Relief Reconciliation Act of 2001* provisions involving education expenses and retirement savings. These provisions included changes to education savings accounts, qualified tuition programs, and individual retirement arrangements (IRA). In addition, the Act created a new tuition and fees deduction and a new retirement savings contribution credit (also referred to as "saver's credit"). These changes were considered significant because they could affect an estimated 86.5 million taxpayers by providing tax benefits of up to $7.6 billion in FY 2003. Properly implementing such changes required the IRS to reprogram its computer systems to ensure that taxpayers received the tax benefits allowed

by the new provisions.

TIGTA's analysis of IRS computer programming requests to prepare for the filing season showed that the requests were timely submitted and were generally accurate; however, some errors and omissions were identified. For example, computer programming requests to implement the new retirement savings contribution credit and request changes to the IRA deduction contained errors that could have denied credits or deductions to some taxpayers. Also, omissions in computer programming requests may have resulted in the loss of tax revenue by allowing certain taxpayers to receive larger credits or deductions than they were eligible to receive. This possibility exists for the new retirement savings contribution credit, the IRA deduction, and the student loan interest deduction.

The IRS Restructuring and Reform Act of 1998

Due to the comprehensive nature of this reform law, the IRS has dedicated significant attention and resources toward implementing the RRA 98 provisions. RRA 98 included fundamental changes to tax law procedures and 71 provisions that increase or further protect taxpayers' rights. The IRS has taken several actions to improve compliance with these provisions. For example, in some instances, the IRS added a higher level of managerial review, implemented new computer controls to prevent certain violations from occurring, and provided additional training and guidance to help employees and managers understand the provisions' requirements. TIGTA has reported that the IRS has fully implemented three taxpayer rights provisions - *Mitigation of Failure to Deposit Penalty, Seizure of Property, and Taxpayer Advocate-Hardships.* The IRS is generally compliant with two other provisions – *Illegal Tax Protestor Designation and Collection Due Process for Liens and Levies.*

RRA 98 required TIGTA to review 10 of the 71 taxpayer rights provisions, as well as 2 other taxpayer rights provisions in prior legislation. TIGTA is currently in the fifth review cycle assessing the mandatory RRA 98 provisions. TIGTA's most recent audit results on these taxpayer rights provisions are as follows:

- *Notice of Levy* – Most levies are computer generated and subjected to systemic controls that effectively ensure that taxpayers are informed of their appeal rights at least 30 days prior to receiving a systemically generated levy. In some circumstances, however, IRS employees must issue manual levies. Though managers approve and review manual levies issued by Automated Collection System employees, manual levies issued by revenue officers are not required to be reviewed and approved by managers. This significantly increases the risk of taxpayers not having their appeal rights properly protected.

- *Restrictions on the use of enforcement statistics to evaluate employees* – A review of 74 judgmentally sampled enforcement employees' performance and related supervisory documentation prepared between October 1, 2001, and August 31, 2002, revealed no instances of the use of tax enforcement results, production quotas, or goals to evaluate employee performance. There was also improvement over the previous year in documenting

the evaluation of employees on the fair and equitable treatment of taxpayers. In addition, a review of 21 statistically sampled supervisors showed the IRS completed the required consolidated office certification memoranda on whether tax enforcement results were used in a prohibited manner.

➤ *Notice of Lien* – An estimated 14,695 lien notifications, out of a population of 367,385 lien notices prepared between August 1, 2001, and June 30, 2002, were not mailed to the taxpayer, the taxpayer's spouse, or to the taxpayer's business partners; or were not mailed to the taxpayer's or spouse's last known address. Taxpayer rights could be affected because the taxpayer who failed to receive a notice or who received a late notice might not be aware of the right to appeal or could have less than the 30-day period allowed by the law to request a hearing.

➤ *Seizures* – TIGTA determined that in a statistical sample of 102 seizures from the 218 seizures conducted by the IRS between October 2001 and June 2002, the IRS complied with legal provisions and internal procedures when seizing taxpayers' property for payment of delinquent taxes.

➤ *Illegal Tax Protestor (ITP) Designations* – The IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been reassigned to a similar ITP designation. In addition, the IRS does not have any current publications with ITP references. However, IRS employees continue to make references to taxpayers as ITPs and other similar designations in case narratives. TIGTA identified 321 taxpayers that were potentially affected due to improper designations. We have not reported that these taxpayers have been harmed by the designations. Only a thorough review of each taxpayer's case and the treatment accorded that taxpayer would determine if these taxpayers have been harmed. In our most recent report on this subject, TIGTA recommended that the IRS review each case where the reference to ITP or similar designation had been identified and make such determinations.

In its response to the draft report, the IRS disagreed with our determination that in order to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case histories.

➤ *Assessment Statute of Limitations* – Employees properly advised taxpayers of their rights to refuse or restrict the scope of the statute extension in 32 of 48 (67 percent) of the tax returns sampled. In 16 of
48 (33 percent) of the tax returns sampled, TIGTA could not determine if employees advised taxpayers of their rights because related case files did not contain a record that taxpayers had been advised of their rights. In 22 of the 24 (92 percent) jointly filed returns sampled, there was no documentation in the related case files that each taxpayer listed on the return was separately informed of his or her rights (i.e., dual notification).

➤ *Denials of Requests for Information Under the Freedom of Information Act* – TIGTA identified an estimated 458 responses to Freedom of Information Act or Privacy Act requests

where information was improperly withheld, out of 4,610 requests for information that were denied in whole or part, or where the IRS replied that responsive records were not available. There were also an estimated 1,052 responses to Internal Revenue Code Section 6103 requests where information was improperly withheld, out of an estimated population of 8,612 requests that were denied or partially denied or where requesters were told that records could not be located.

➢ *Collection Due Process* – The IRS substantially complied with the requirements of the law and ensured taxpayers' appeal rights were protected in 85 of 87 (98 percent) appeal cases reviewed. In the remaining 2 cases, TIGTA did not conclude that the noncompliance resulted in a legal violation of the taxpayer's Collection Due Process (CDP) rights since collection actions were not initiated. In addition, approximately 94 percent of the CDP determination letters provided to taxpayers (82 of 87 letters) followed the established IRS guidelines. This was a noticeable improvement over prior audit results when approximately 14 percent of the determination letters were determined deficient.

Neither TIGTA nor the IRS could evaluate the IRS' compliance with the following four provisions since IRS management information systems are not available to track the specific cases:

- Restrictions on directly contacting taxpayers instead of authorized representatives.
- Taxpayer complaints.
- Separated or divorced joint filer requests.
- Fair Debt Collection Practices Act (FDCPA) Violations – The IRS does track potential FDCPA violations on its computer systems; however, we determined that data on one system may not always be complete and accurate. Based on information recorded as potential FDCPA violations on the IRS' computer system, TIGTA identified two violations that occurred after July 22, 1998, that resulted in administrative actions being taken against employees. The IRS had no closed cases in which the IRS paid any money to taxpayers for civil actions resulting from FDCPA violations.

## Tax Compliance Efforts

The IRS' goal of providing world-class service to taxpayers hinges on the theory that, if the IRS provides the right mix of education, support, and up-front problem solving to taxpayers, the overall rate of voluntary compliance with the tax laws will increase. The compliance program (examining tax returns and collecting tax liabilities) would then address those taxpayers who purposefully did not comply. The challenge to IRS management is to establish a tax compliance program that identifies those citizens who do not meet their tax obligations, either by not paying the correct amount of tax or not filing proper tax returns.

Enforcement actions against individuals and businesses that purposefully conceal tax liabilities or even refuse to submit tax returns have fallen dramatically, despite concerns that tax cheating

remains at high levels. The following chart exhibits the fact that, since FY 1996, the level of IRS enforcement activities has significantly declined.

| Enforcement Action | Overall Decline FY 1996 – FY 2002 |
|---|---|
| Face-to-Face Audits | 70% |
| Correspondence Audits | 56% |
| Liens | 34% |
| Levies | 79% |
| Seizures | 97% |

The overall decline in enforcement actions has been primarily attributed to a long-term reduction in enforcement staffing, to redirection of resources to customer service functions during the filing season, a decline in direct examination time, and to IRS employees' concerns over the mandatory termination provision in Section 1203 of RRA 98.

IRS management and many stakeholders have been concerned about the decline in enforcement activities. However, the IRS has not conducted Taxpayer Compliance Measurement Program audits since 1988. Therefore, it currently has no reliable method to measure voluntary compliance or the effect that increased customer service and diversion of compliance resources are having on voluntary compliance. TIGTA believes that the ongoing National Research Program is a much-needed first step for providing the information necessary to gauge compliance levels and direct IRS compliance resources towards areas where attention is most needed.

While the decline in enforcement actions since FY 1996 has been dramatic, there are recent indications that the decline in some categories of enforcement actions and results has stabilized and, in some cases, shown improvement. For example, the IRS' FY 2002 compliance efforts and results were mixed, but showed some continuing positive changes that started in FY 2001. Specifically, the level of compliance activities and the results obtained in many, but not all, Collection areas in FY 2002 showed a continuing increase. The number of examinations of tax returns increased in FY 2002, but the overall percentage of tax returns examined stayed about the same due to increases in the number of tax returns filed. The IRS is taking a number of steps to enhance its compliance programs, including:

- Conducting the National Research Program, which is designed to measure the level of

compliance nationwide.

- Restructuring many Collection and Examination processes.
- Focusing on known compliance problems through programs like the Offshore Voluntary Compliance Initiative and the use of Private Collection Agencies.

## Section 1203 Violations

In addition to our audit responsibilities, RRA 98 charges TIGTA with investigating Section 1203 violations. Section 1203 identifies standards of conduct for IRS employees that are intended to address serious and willful acts of misconduct. Section 1203 requires the Commissioner of Internal Revenue to terminate the employment of any IRS employee found guilty of any 1 of 10 specific acts or omissions. TIGTA's role in investigating these allegations of employee misconduct serves to protect taxpayer rights and assure integrity in IRS operations.

The IRS monitors Section 1203 complaints in its Automated Labor and Employee Relations Tracking System - known by its acronym, "ALERTS." The vast majority of Section 1203 complaints recorded in ALERTS have alleged that an IRS employee violated a provision of the Internal Revenue Manual or the Internal Revenue Code in order to retaliate against or harass another person. The second category, as measured by the number of complaints, involves the employee's understatement of Federal tax liabilities.

The IRS receives and adjudicates numerous Section 1203 allegations where no independent TIGTA investigation is needed. When TIGTA involvement is warranted, our focus is to determine the facts of the situation as well as the intent of the violating employee. An employee's intent is an essential element that must be present for Section 1203 disciplinary action to be taken. As of March 31, 2003, ALERTS indicated that 96 employees have been fired and 202 employees have resigned or retired as a result of TIGTA and IRS investigations. Since the inception of Section 1203, TIGTA and the IRS have received a combined total of 5,605 Section 1203 complaints.

TIGTA and the IRS are working together to continuously improve the process of receiving, investigating, and adjudicating alleged violations of Section 1203. In March 2002, a streamlined process was implemented which, enabled TIGTA to make an early differentiation between those 1203 allegations that are valid and those that are not. As a result, TIGTA has been able to devote its resources to the investigation of bona fide 1203 allegations and other employee misconduct.

Mr. Chairman and Members of the Committees, I appreciate the opportunity to share with you today the more significant challenges that confront the new Commissioner and IRS senior management. Although the IRS has accomplished a great deal since the passage of RRA 98, much more remains to be done. TIGTA will continue its efforts to provide reliable and objective assessments of the IRS' progress in balancing compliance and customer service, and to investigate employee misconduct or external threats that jeopardize the integrity, efficiency, and effectiveness of the nation's tax administration system.

---

Case 1:06-cv-01226-JDB Document 13-2 Filed 04/09/2007 Page 123 of 151

[1]

The Form 94X family of returns is used by employers to report income and unemployment taxes withheld from employee wages.

[2]

Form 720 is the Quarterly Federal Excise Tax Return.

[3]

Estimated tax returns (electronic and paper) based on 1999 statistics.

# Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued

## April 2004

## Reference Number: 2004-30-094

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

April 29, 2004

MEMORANDUM FOR COMMISSIONER, SMALL BUSINESS/ SELF-EMPLOYED DIVISION

FROM:        *(for)*   Gordon C. Milbourn III /s/ Margaret E. Begg
            Acting Deputy Inspector General for Audit

   SUBJECT:    Final Audit Report - Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued  (Audit # 200330031)

This report presents the results of our review to determine whether the Internal Revenue Service (IRS) has complied with 26 United States Code (U.S.C.) Section (§) 6330, Notice and Opportunity for Hearing Before Levy.  The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating any levy action, to give taxpayers an opportunity to formally appeal the proposed levy. Specifically, we determined whether the IRS has sufficient controls in place to ensure taxpayers are advised of their right to a hearing at least 30 days prior to levy action. This is the sixth annual report the Treasury Inspector General for Tax Administration (TIGTA) has issued in compliance with the RRA 98 to determine whether the IRS is complying with legal guidelines over the issuance of levies.

Prior TIGTA reports have recognized that the IRS has implemented tighter controls over

the issuance of systemically generated levies. This was due primarily to the development of systemic controls in both the Automated Collection System and Integrated Collection System (ICS) to prevent a levy from being generated unless there were at least 30 days between the date taxpayers received notice of their appeal rights and the date of the proposed levy. Our testing of these controls indicated that they continue to function effectively.

However, last year's report also discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. The IRS declined to implement this recommendation but did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued. Our review of manual levies issued between July 1 and October 31, 2003, indicated that this corrective action was not effective. Revenue officers are still not always properly notifying taxpayers of their appeal rights. Specifically, in 5 of 40 cases reviewed, we determined that revenue officers issued manual levies to seize the assets of taxpayers who had not been notified of their appeal rights. We recommended the Commissioner, Small Business/Self-Employed Division, reconsider requiring managers to review all manual levies prepared by a revenue officer.

Management's Response: While IRS management agreed that taxpayers' rights must be protected, they did not agree with our recommendation to have group managers approve all manual levies prepared by revenue officers. They expressed concern about the impact on field employees that further increasing the oversight of enforcement action could have. IRS management also indicated they believe the errors evidence a training issue.

To help address these concerns and reinforce the existing procedures, the IRS issued an ICS Alert on March 5, 2004. This Alert reminded employees to ensure taxpayer rights are protected whenever a manual levy is issued. Management's complete response to the draft report is included as Appendix V.

Office of Audit Comment: We recognize the IRS' caution in implementing any managerial action it believes may inhibit effective enforcement action by revenue officers. However, we also recognize the importance of the RRA 98 provision requiring that taxpayers be properly advised of their appeal rights prior to asset seizure through levy action. We hope the IRS' issuance of the ICS Alert reminding revenue officers that all notice requirements must be satisfied before a manual levy is issued will suffice to ensure taxpayer rights are adequately safeguarded. While we still believe our recommendation is worthwhile, we do not intend to elevate our disagreement concerning

it to the Department of the Treasury for resolution. We will continue to closely monitor this issue during future mandatory reviews of the IRS' collection activities.

Copies of this report are also being sent to IRS managers affected by the report recommendation. Please contact me at (202) 622-6510 if you have questions or Parker Pearson, Acting Assistant Inspector General for Audit (Small Business and Corporate Programs), at (410) 962-9637.

## Table of Contents

Background

Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively

Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

Recommendation 1:

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Management's Response to the Draft Report

## Background

When taxpayers refuse to pay delinquent taxes, the Internal Revenue Service (IRS) has authority to work directly with financial institutions and other third parties to seize taxpayers' assets. This action is commonly referred to as a "levy." The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating a levy action, to give taxpayers an opportunity to formally appeal the proposed levy.

The RRA 98 also requires the Treasury Inspector General for Tax Administration (TIGTA) to annually verify whether the IRS is complying with the new provisions. This is the sixth year that the TIGTA has evaluated the controls over levies.

Two operations within the IRS issue levies to collect delinquent taxes:

- The Automated Collection System (ACS), where Customer Service Representatives (CSR) contact delinquent taxpayers by telephone to collect unpaid taxes and secure tax returns.

- The Collection Field function (CFf), where revenue officers contact delinquent taxpayers in person as the final step in the collection process. Field contact becomes necessary when the ACS does not resolve the tax matter. Delinquent cases that are assigned to revenue officers in the IRS field offices are controlled and monitored with the Integrated Collection System (ICS).

Both operations issue two types of levies: systemically generated levies and manual levies. Previous TIGTA reports have recognized the IRS has significantly improved controls over the issuance of systemically generated levies. However, the TIGTA's June 2003 report did identify that additional controls are needed over manual levies issued by revenue officers.

This review was conducted at the Small Business/Self-Employed (SB/SE) Division Headquarters in New Carrollton, Maryland, and at Compliance Area 3 and 11 Offices, headquartered in Philadelphia, Pennsylvania, and Denver, Colorado, respectively. We conducted the audit from October 2003 through February 2004 in accordance with *Government Auditing Standards.*

Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

## Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively

Systemic controls in both the ACS and ICS are effective to ensure taxpayers receive timely notification of their appeal rights.

### ACS controls

The first step in the collection process involves mailing taxpayers a series of notices asking for payment of delinquent taxes. If taxpayers do not comply, the majority of the accounts are forwarded to an ACS Call Center where CSRs contact taxpayers by telephone to resolve their accounts. If accounts cannot be resolved, CSRs have the authority to issue levies.

Virtually all levies issued by CSRs are generated through the ACS' automated system. This automated system contains a control, developed to comply with the RRA 98, that compares the date the taxpayer was notified of the pending levy with the date requested for the actual levy. If there are fewer than 30 days between the dates, the system will not generate a levy. This control is designed to ensure taxpayers have been notified at least 30 days prior to the levy and have been informed of their appeal rights for any systemically generated levy.

We tested the effectiveness of this control by reviewing a random sample of 30 systemically generated levies issued by the ACS between July 1 and October 31, 2003. All 30 taxpayers were timely notified of their appeal rights. During fieldwork, we also tested the control by requesting a levy on a live case for which fewer than 30 days had elapsed since the final notice date. The system would not issue the levy. Based on these results, we concluded that the systemic controls over levies issued in the ACS Call Centers effectively protect taxpayers' appeal rights.

**ICS controls**

Many times, notices and telephone calls to taxpayers do not successfully resolve delinquent accounts, and cases have to be assigned to revenue officers in CFf offices for face-to-face contact with taxpayers. Cases assigned to revenue officers are controlled on the ICS. Revenue officers use the ICS to record collection activity on delinquent cases and generate certain enforcement actions such as levies.

The IRS installed a control in the ICS similar to the control in the ACS that prevents a levy from being issued unless taxpayers have received 30 days notice and been informed of their appeal rights. If fewer than 30 days have elapsed since the final notice date, the system will not generate a levy.

We tested the effectiveness of this systemic control by reviewing a random sample of 30 ICS cases that had levies issued between July 1 and October 31, 2003. All 30 of the taxpayers had received notification of their appeal rights at least 30 days prior to the levy. Next, we tested the control by attempting to generate a levy on a live case for which fewer than 30 days had elapsed since the final notice date. The system would not issue the levy.

Finally, we tested another systemic control by attempting to alter a critical date in the ICS history section. We could not alter the date to generate the levy. Based on these results, we concluded that the systemic controls over levies issued by revenue officers in CFf offices effectively protect taxpayers' appeal rights.

While the IRS has done an effective job of implementing controls over systemic levies generated by the ACS and ICS, additional controls are needed over manual levies issued by revenue officers.

## Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

The second type of levy that both CSRs and revenue officers can issue is the manual levy. That is, the levy is issued outside of the ACS and ICS automated processes and is not subject to the systemic controls.

Because manual levies are issued outside of the ACS and ICS automated processes, an automated audit trail for these actions is not produced. Therefore, it is impossible to reliably determine the exact number of manual levies that were issued by either CSRs or revenue officers during our

review period. IRS management did inform us that they believe manual levies are issued infrequently.

Although the ACS CSRs primarily issue levies systemically, they also issue manual levies under certain circumstances, such as levies on Individual Retirement Accounts and jeopardy situations. Manual levies require the same advance notification of the taxpayer as systemic levies except in cases involving jeopardy situations. IRS procedures require that manual levies issued by CSRs be reviewed and approved by a manager prior to the levy being issued. We consider this managerial review to be a strong control.

Revenue officers similarly issue levies systemically, in most cases, through the ICS. They are also authorized to issue a manual levy on any case as needed. While managerial approval is mandatory for manual levies issued by ACS employees, no review or approval is required when revenue officers issue a manual levy.

We believe there is a high risk associated with these manual levies because the IRS has not implemented any controls to ensure taxpayers' appeal rights are protected as required by the RRA 98. Our June 2003 report discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. The IRS declined to implement this recommendation because it believed it would impede prompt enforcement action. The IRS did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued.

We analyzed the ICS case inventory assigned to revenue officers to identify any manual levies issued between July 1 and October 31, 2003. Because there is no automated audit trail produced for manual levies, we analyzed case history comments for any references to a manual levy. Using this methodology, we identified 40 cases in which a manual levy was issued to seize taxpayers' assets. In 5 of the 40 cases, the revenue officer did not properly notify the taxpayers of their appeal rights before issuing the manual levies. None of the five manual levies involved jeopardy situations. Because of the imprecise nature of revenue officer case history entries, there could have been significantly more manual levies issued during our review period than the 40 we identified.

Not offering appeal rights to taxpayers prior to issuing levies is a potential Section 1203 violation of the RRA 98 and could result in the revenue officer being terminated for misconduct. We have referred the five cases to the TIGTA Office of Investigations for further evaluation.

## Recommendation

1.  The Commissioner, SB/SE Division, should reconsider developing and implementing controls over manual levies issued by revenue officers working in the IRS field offices to

notice date.

C. Tested whether IRS employees could modify the final notice date in the ACS and ICS.

D. Selected a random sample of 30 ICS levies from the population of 110,670 levies issued between July 1 and October 31, 2003, from the ICS database of open cases. We analyzed Master File transcripts and the ICS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

E. Selected a random sample of 30 ACS levies from the population of 510,288 levies issued between July 1 and October 31, 2003, from the ACS database of open cases. We analyzed Master File transcripts and the ACS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

II. Determined whether manual levies issued by revenue officers complied with legal guidelines in 26 U.S.C. § 6330.

A. Identified any references to manual levies issued between July 1 and October 31, 2003, by querying the narrative history text field of the ICS open case inventory. We identified a population of 40 manual levies that were issued during our review period and included all of them in our review.

1. Requested complete case history files (history query) for all cases containing references to manual levies identified in step II.A.

2. Reviewed case history documentation and identified whether a revenue officer had issued a manual levy.

3. Analyzed Master File transcripts and ICS history files to determine whether taxpayers were provided at least 30 days notice prior to any levy action initiated by the IRS.

**Appendix II**

## Major Contributors to This Report

Parker F. Pearson, Acting Assistant Inspector General for Audit (Small Business and Corporate

.

Programs)
Richard Dagliolo, Director
Anthony J. Choma, Audit Manager
Cynthia Dozier, Senior Auditor
Mildred Rita Woody, Senior Auditor
Seth Siegel, Auditor

**Appendix III**

## Report Distribution List

Commissioner  C
Office of the Commissioner – Attn:  Chief of Staff  C
Deputy Commissioner for Services and Enforcement  SE
Commissioner, Wage and Investment Division  SE:W
Acting Deputy Commissioner, Small Business/Self-Employed Division  SE:S
Deputy Commissioner, Wage and Investment Division  SE:W
Acting Director, Compliance, Small Business/Self-Employed Division  SE:S:C
Director, Compliance, Wage and Investment Division  SE:W:CP
Director, Strategy and Finance, Wage and Investment Division  SE:W:S
Chief Counsel  CC
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:
      Commissioner, Small Business/Self-Employed Division  SE:S
Commissioner, Wage and Investment Division  SE:W

**Appendix IV**

## Outcome Measures

This appendix presents detailed information on the measurable impact that our recommended corrective action will have on tax administration.  This benefit will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Taxpayer Rights and Entitlements – Actual; five taxpayers did not receive notice of

Case 1:06-cv-01226-JDB Document 13-2 Filed 04/09/2007 Page 133 of 151

their appeal rights before the Internal Revenue Service (IRS) took levy action (see page 4).

Methodology Used to Measure the Reported Benefit:

We analyzed (using computerized queries) the Integrated Collection System case inventory of delinquent taxpayers assigned to revenue officers and identified 40 manual levies issued between July 1 and October 31, 2003. Since the IRS does not monitor or record the use of manual levies, we were unable to determine the total number of manual levies actually issued by revenue officers working in field offices. Because the population of manual levies is unknown, the findings of our case review cannot be projected.

**Appendix V**

## Management's Response to the Draft Report

*The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.*

# Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

**July 2005**

**Reference Number: 2005-40-104**

---

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

July 5, 2005

MEMORANDUM FOR DEPUTY COMMISSIONER FOR SERVICES AND ENFORCEMENT
DEPUTY COMMISSIONER FOR OPERATIONS SUPPORT

FROM: *(for)* Pamela J. Gardiner /s/ Margaret E. Begg
Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Audit # 200440052)

This review presents the results of our review of the Internal Revenue Service's (IRS) use of the designation "Illegal Tax Protester" (ITP) and similar designations. The overall objective of this review was to determine whether the IRS complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as ITPs or any similar designations.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

RRA 98 § 3707 prohibits the IRS from referring to taxpayers as ITPs or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate IRS compliance with the prohibition on the use of ITP or any similar designations.

In summary, the IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been assigned similar Master File designations. In addition, the IRS does not have any current publications with ITP references and has initiated actions to remove ITP references from the various forms of the Internal Revenue Manual (IRM).

In 309 isolated instances, IRS employees continued to make references to taxpayers as ITPs and other similar designations in case narratives. The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. However, in its response to our Fiscal Year (FY) 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

Management's Response: Since the IRS Office of the Chief Counsel issued an opinion that references to taxpayers as ITPs or similar designations in case narratives are not a violation of RRA 98 § 3707, the IRS continues to disagree with our determination on this issue. As a result, the IRS does not concur with our outcome measure as claimed. In addition, the IRS stated that all ITP designations will be removed from the IRM by the end of FY 2005. We will confirm whether all ITP designations have been removed from the IRM during next year's mandatory review. Management's complete response to the draft report is included as Appendix VII.

Office of Audit Comment: We continue to believe it is reasonable to conclude that, based upon the language of RRA 98 § 3707, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

RRA 98 § 3707 provides that officers and employees of the IRS shall not designate taxpayers as ITPs or any similar designations. While there is little interpretive information provided concerning this provision, the Senate Committee Report (S. Rep. No. 105-174) states that the Committee is concerned taxpayers might be stigmatized by designation as an ITP. Further, the Report's explanation of this provision states that existing designations in the Master File must be removed and any other designations, such as on paper records that have been archived, must be disregarded.

We have not reported that those taxpayers designated by IRS employees as ITPs or similar designations have been harmed by these designations. Only a thorough review of each taxpayer's case and the treatment accorded the taxpayer would determine if these taxpayers have been harmed. Because the TIGTA is required to annually evaluate the IRS' compliance with this provision of the law, we have elevated the disagreement about whether employees are labeling taxpayers as ITPs to the Department of the Treasury and encourage the IRS to raise the issue as well.

Copies of this report are also being sent to the IRS managers affected by the report results. Please contact me at (202) 622-6510 if you have questions or Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs), at (202) 927-0597.

## Table of Contents

Background

Illegal Tax Protester Codes Were Not Used on the Master File

Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

Appendix VI – Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

Appendix VII – Management's Response to the Draft Report

## Background

Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 prohibits the IRS from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. In addition, the RRA 98 requires the removal of all existing ITP codes from the IRS Master File and instructs IRS employees to disregard any such designation not located on the Individual Master File.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

The Congress had concerns that some taxpayers were being permanently labeled and stigmatized by the ITP designation. Taxpayers who subsequently complied with the tax laws could continue to be labeled as ITPs, which could bias IRS employees and result in unfair treatment.

Internal Revenue Code § 7803(d)(1)(A)(v) (2000) requires the Treasury Inspector General for Tax Administration to annually evaluate IRS compliance with the prohibition against using ITP or any similar designations. This is our seventh review since Fiscal Year (FY) 1999. These reviews have identified areas for improvement to help the IRS comply with the ITP designation prohibition.

This review was performed in the Appeals function, Criminal Investigation function, National Taxpayer Advocate function, and Office of Chief Counsel in Washington, D. C.; the Small Business/Self-Employed (SB/SE) Division in New Carrollton, Maryland; and the Wage and Investment (W&I) Division in Atlanta, Georgia, during the period September 2004 through April 2005. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

### Illegal Tax Protester Codes Were Not Used on the Master File

In prior reviews, we reported the IRS had removed the ITP codes from the Master File as required by RRA 98 § 3707. The ITP designation has not been reintroduced on the Master File.

RRA 98 § 3707 also prohibits using any designation similar to ITP. A review of the approximately 57,000 taxpayer accounts formerly coded as ITPs on the Master File identified no reassignments of these taxpayer accounts to any other Master File designation similar to ITP.

### Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

To help promote compliance with RRA 98 § 3707, IRS management issued directives for employees to update various publications to eliminate references to ITP terminology and programs. A review of IRS publications identified no ITP references.

### The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

In each of the six prior reviews, we identified multiple subsections throughout the various forms of the Internal Revenue Manual (IRM) that contained ITP references. During our FY 2004 review, we reported that there were 24 unique ITP references throughout the various forms of the IRM. In response to our report, the IRS stated that it had initiated actions to remove all remaining ITP references from the IRM.

In our current review, we found 19 unique ITP references in various versions of the IRM. Office of Chief Counsel management had already updated and removed 18 of

these references from their functional IRM maintained on the IRS Intranet. IRS management informed us that 18 of the 19 references we identified should be removed as other IRM versions are updated to incorporate functional IRM revisions. One additional ITP reference was identified in the SB/SE Division functional IRM. In January 2005, we notified SB/SE Division management of this remaining ITP reference for correction.

Removing all ITP references from the various forms of the IRM would prevent IRS employees from being inadvertently encouraged to improperly label taxpayers as ITPs. Based on the actions taken, we believe no further recommendations are warranted at this time.

## Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Our FY 2005 review of a sample of computer systems used by IRS employees to document case activity identified 309 isolated instances in which 272 employees designated taxpayers as "tax protesters," "ITPs," "constitutionally challenged," or other similar designations. These actions are prohibited by RRA 98 § 3707. However, employees are allowed to document any statements made by a taxpayer or his or her representatives, and quoting a taxpayer's self-designation as an ITP is not prohibited by RRA 98 § 3707. A chart detailing where inappropriate IRS employee comments were made can be found in Appendix V, and examples of the inappropriate comments can be found in Appendix VI.

The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. On October 11, 2002, the IRS issued a Servicewide Electronic Research Program (SERP) alert reminding employees of the prohibition regarding the use of ITP or any similar designations. Business and functional units independently continued to take additional steps to address this issue. These included sending out additional guidance in the form of SERP alerts, email alerts, and memoranda; updating training; conducting quality reviews for ITP use; and counseling employees that continued to designate taxpayers as ITPs or other similar designations.

However, in response to our FY 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

We believe it is reasonable to conclude that, based upon the language of the statute, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

In isolated instances, employees referred to taxpayers specifically using ITP or similar designations in case narratives input on the following IRS computer systems between October 2003 and September 2004:

- Appeals Centralized Database System (ACDS): A review of 93,961 open Appeals narrative comment records identified 1 case in which 1 employee used similar designations when referring to a taxpayer in his or her case narrative.
- Automated Collection System (ACS): A review of approximately 2.4 million open ACS records identified 49 cases in which 44 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.
- Criminal Investigation Management Information System (CIMIS): A review of 19,020 open and closed cases identified 3 cases in which 3 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.
- Integrated Collection System (ICS): A review of approximately 1.1 million open ICS records identified 214 cases in which 187 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.
- Taxpayer Advocate Management Information System (TAMIS): A review of 34,537 open TAMIS records identified 2 cases in which 2 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.
- Taxpayer Information File (TIF): A review of approximately 17.2 million open TIF records identified 40 history notations in which 35 employees used ITP or similar designations when referring to specific taxpayers in the Activity Code field of the TIF.

This is the first year we evaluated the Activity Code field on the TIF. In addition to the 40 account history notes input between October 2003 and September 2004, we

identified 315 additional instances in which account history notes contained ITP or similar designations input prior to and after FY 2004.

We notified W&I Division and SB/SE Division management of the instances in which employees had used the account history notes section on the TIF to label taxpayers as ITPs or similar designations. W&I Division management immediately issued an alert to remind employees not to designate taxpayers as ITPs or anything similar in the account history notes. W&I Division management is also working with SB/SE Division management to eliminate the existing ITP and similar designations from the TIF.

In addition, we identified 116 instances in various case narratives in which employees had made references or inferences about the taxpayers' actions (e.g., taxpayer sent letters containing "typical protester language" or the taxpayer responded with "protester jargon"). We agree with the IRS that merely making references to a taxpayer's actions does not constitute a designation prohibited by this statutory provision. However, we are concerned these references could become, or be considered, permanent labels that could subsequently stigmatize taxpayers in future contacts with the IRS.

Since the IRS has previously taken actions to address many of these issues and there is an outstanding question concerning the legal interpretation of RRA 98 § 3707, we believe no further recommendations are needed at this time.

**Appendix I**

## Detailed Objective, Scope, and Methodology

The objective of this review was to determine whether the Internal Revenue Service (IRS) complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate the IRS' compliance with the prohibition against using ITP or any similar designations. To complete this objective, we:

I. Determined if the ITP coding on the IRS Master File was removed by reviewing all Accelerated Issuance Codes (Transaction Code 148) as of November 2004 for Business Master File (BMF) records and Individual Master File (IMF) records. We analyzed 102,860 BMF records and 614,246 IMF records containing a Transaction Code 148 on the account. We generally relied on the TIGTA Office of Information Technology for validation of the data provided to us. However, we did a limited validation of the data by researching a judgmental sample of 25 Taxpayer Identification Numbers (TIN) and 25 Employer Identification Numbers on the Integrated Data Retrieval System (IDRS).

We also compared our historic computer extract of approximately 57,000 taxpayers designated as ITPs before the RRA 98 was enacted to our BMF and IMF records with an Accelerated Issuance Code (Transaction Code 148) to determine if any new common codes were being used to classify the taxpayers as ITPs.

II. Determined if the IRS Internal Revenue Manual (IRM) contained ITP or any similar designations by performing key word searches of the Servicewide Policy, Directive, and Electronic Research system; the Servicewide Electronic Research Program (SERP); the IRS electronic publishing Intranet web site; the IRS public Internet web site; and paper IRMs in December 2004. In addition, we determined if the Chief Counsel Directives Manual located on the IRS Office of Chief Counsel web site contained ITP or any similar designations by performing key word searches in December 2004. We specifically searched for corrections to the exceptions identified in our Fiscal Year 2004 report and determined if there were any new references.

III. Determined if IRS publications still contained ITP or any similar designations by performing key word searches of the SERP, the IRS public Internet web site, and the IRS electronic publishing Intranet web site in October 2004 and the IRS 2004 Federal Tax Products CD-ROM in December 2004.

IV. Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Integrated Collection System (ICS) by securing a copy of the ICS database and analyzing 1,083,521 ICS records open as of September 2004 with history action dates between October 2003 and September 2004. We did not perform a detailed validation of the ICS data because this information was provided directly from the IRS through the TIGTA Data Center Warehouse (DCW). However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

V. Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Automated Collection System (ACS) by securing a copy of the ACS database and analyzing 2,398,739 ACS records open as of September 2004 with history action dates between October 2003 and September 2004. We did not perform a detailed validation of the ACS data because this information was provided directly from the IRS through the TIGTA DCW. However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

VI. Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Taxpayer Advocate Management Information System (TAMIS) by securing a copy of the TAMIS database and analyzing 34,537 open TAMIS records with activity between October 2003 and September 2004. The Taxpayer Advocate Service provided the data and validation information to us. The TIGTA DCW staff validated the TAMIS data received. In addition, we did a limited validation of data accuracy and completeness by looking up a judgmental sample of 25 cases by accessing TAMIS online.

VII. Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Appeals Centralized Database System (ACDS) by securing a copy of the ACDS database and analyzing 93,961 open Appeals narrative comment records identified as received in the Appeals function between October 2003 and September 2004. The data were provided directly from the IRS through the TIGTA DCW. However, we did a limited validation of data accuracy and completeness by looking up a judgmental sample of 31 case records by accessing the ACDS online.

VIII. Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Criminal Investigation Management Information System (CIMIS) by securing a copy of the CIMIS database and analyzing 19,020 cases opened on the CIMIS between October 2003 and September 2004. The data were provided directly from the IRS and validated by the TIGTA Chicago Audit group.

IX. Determined if employees were using ITP or any similar designations on the Taxpayer Information File (TIF) by analyzing 12,341,522 IMF and 4,901,558 BMF taxpayer accounts open on the IDRS as of January 2005 with Activity Code dates input between October 2003 and September 2004. Since this was the first year we looked at the Activity Code field on the TIF, we also looked at taxpayer accounts that contained ITP or similar designations input before October 2003 and after September 2004.

**Appendix II**

## Major Contributors to This Report

Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs)
Mary V. Baker, Director
Bryce Kisler, Audit Manager
Alan Lund, Lead Auditor
Tanya Boone, Senior Auditor
Julia Tai, Senior Auditor
Craig Pelletier, Auditor

**Appendix III**

## Report Distribution List

Commissioner C
Office of the Commissioner – Attn: Chief of Staff C
Commissioner, Small Business/Self-Employed Division SE:S
Commissioner, Wage and Investment Division SE:W

Chief, Appeals AP
Director, Office of Research, Analysis, and Statistics RAS
Chief, Criminal Investigation SE:CI
Chief Information Officer OS:CIO
Director, Communications and Liaison, National Taxpayer Advocate TA:CCL
Director, Office of Servicewide Policy, Directives, and Electronic Research RAS:SPDER
Director, Collection, Small Business/Self-Employed Division SE:S:C
Director, Communications, Government Liaison, and Disclosure, Small Business/Self-Employed Division SE:S:CGL&D
Director, Compliance, Wage and Investment Division SE:W:CP
Acting Director, Strategy and Finance, Wage and Investment Division SE:W:S
Acting Chief, Performance Improvement, Wage and Investment Division SE:W:S:PI
Chief Counsel CC
National Taxpayer Advocate TA
Director, Office of Legislative Affairs CL:LA
Director, Office of Program Evaluation and Risk Analysis RAS:O
Office of Management Controls OS:CFO:AR:M
Audit Liaisons:
GAO/TIGTA Liaison, Deputy Commissioner for Operations Support OS
GAO/TIGTA Liaison, Deputy Commissioner for Services and Enforcement SE
GAO/TIGTA Liaison, National Taxpayer Advocate TA
GAO/TIGTA Liaison, Appeals AP:P:S
Acting Chief, Customer Liaison, Small Business/Self-Employed Division SE:S:COM
Acting Senior Operations Advisor, Wage and Investment Division SE:W:S
GAO/TIGTA Liaison, Chief Information Officer OS:CIO:SM:PO
GAO/TIGTA Liaison, Criminal Investigation SE:CI:S:PS

**Appendix IV**

## Outcome Measures

This appendix presents detailed information on the measurable impact that the review results will have on tax administration. While no recommendations were made in this report, the Treasury Inspector General for Tax Administration has made prior recommendations that continue to provide benefits. These benefits will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Taxpayer Rights and Entitlements – Actual; 309 taxpayers affected (see page 3).

Methodology Used to Measure the Reported Benefit:

We reviewed the following:

- From the Appeals Centralized Database System (ACDS) – a total of 93,961 open Appeals narrative comment records received between October 2003 and September 2004 and identified 1 case narrative that contained Illegal Tax Protester (ITP) or a similar designation.
- From the Automated Collection System (ACS) – approximately 2.4 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 49 taxpayer case narratives that contained ITP or a similar designation.

- From the Criminal Investigation Management Information System (CIMIS) – a total of 19,020 cases opened between October 2003 and September 2004 and identified 3 taxpayer case narratives that contained ITP or a similar designation.
- From the Integrated Collection System (ICS) – approximately 1.1 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 214 taxpayer case narratives that contained ITP or a similar designation.
- From the Taxpayer Advocate Management Information System (TAMIS) – a total of 34,537 open cases with activity between October 2003 and September 2004 and identified 2 taxpayer case narratives that contained ITP or a similar designation.
- From the Taxpayer Information File (TIF) – approximately 17.2 million taxpayer accounts open on the IDRS as of January 2004 with TIF Activity Code dates input between October 2003 and September 2004 and identified 40 taxpayer history notations that contained ITP or a similar designation.

Type and Value of Outcome Measure:

- Reliability of Information – Actual; 19 unique Internal Revenue Manual (IRM) subsections (see page 2).

Methodology Used to Measure the Reported Benefit:

In December 2004, we searched various versions of the IRM available to Internal Revenue Service (IRS) employees for ITP references. These were found on the Servicewide Electronic Research Program (SERP), the IRS publishing web site, the IRS public Internet web site, and paper.

## Appendix V

### Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

| Exception Location | Fiscal Year 2003 Review | | | Fiscal Year 2004 Review | | | Fiscal Year 2005 Review | | |
|---|---|---|---|---|---|---|---|---|---|
| | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use |
| Appeals Centralized Database System (ACDS) | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| Automated Collection System (ACS) | 77 | 66 | 17 | 41 | 31 | 13 | 44 | 38 | 11 |
| Criminal Investigation Management Information System (CIMIS) | 0 | 0 | 0 | 5 | 2 | 3 | 3 | 0 | 3 |

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

- TAXPAYER SEEMS NOT TO BELIEVE IN TAXATION. TP [taxpayer] MAY BE A TAX COMPLIANCE CHALLENGED TAXPAYER.
- TP [taxpayer] VERY NASTY PROTESTER.

Appendix VII

## Management's Response to the Draft Report

*The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.*

http://www.treas.gov/tigta/auditreports/2005reports/200540104fr.html (10 of 10)6/2/2006 9:45:35 AM

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Integrated Collection System (ICS)** | 209 | 93 | 135 | 153 | 76 | 101 | 187 | 95 | 119 |
| **Taxpayer Advocate Management Information System (TAMIS)** | 4 | 0 | 4 | 4 | 3 | 1 | 2 | 0 | 2 |
| **Taxpayer Information File (TIF)** | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 36 | 4 |
| **TOTALS** | 292 | 159 | 158 | 203 | 112 | 118 | 272 | 169 | 140 |

*Source: Various Internal Revenue Service case narratives and Treasury Inspector General for Tax Administration reports entitled Fiscal Year 2003 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2003-40-098, dated April 2003) and Fiscal Year 2004 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2004-40-109, dated June 2004).*

**Appendix VI**

## Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

During our Fiscal Year 2005 review, we searched for the following words and abbreviations to identify Illegal Tax Protester (ITP) and other similar designations being used by Internal Revenue Service (IRS) employees in their case narratives. We did not take exception to employee comments quoting a taxpayer's self-designation as an ITP.

| | | | |
|---|---|---|---|
| • CHALLENGE | • CHLLNG | • CNSTTTNL | • CONGRESSIONAL |
| • CONSTITUTIONAL | • ITP | • OBJECTOR | • PROTESTER |
| • PROTESTOR | • PROTESTR | • PROTSTR | • PRTSTR |

The following comments made by employees are a few examples of ITP and similar designations found in IRS employees' case narratives.

- THIS TP [taxpayer] IS A TAX PROTESTER.
- HERE WE HAVE A LONG TIME COMPLIANCE CHALLENGED NON-TAXPAYER WHO HAS A 15 YEAR RECORD OF NOT PAYING [gender removed] TAXES.
- TP [taxpayer] IS A NON COMPLIANCE FILER AKA [also known as] IN THE OLD DAYS AS A TAX PROTESTOR.
- IT IS CLEAR THAT TP [taxpayer] IS A TAX PROTESTOR ALTHOUGH [gender removed] STATES IN [gender removed] LETTER THAT [gender removed] IS NOT.
- NOW I SEE THE PROTESTOR BEGINNING TO COME OUT.
- MR. & [and] MRS. [name removed] HAVE NOT BEEN COOPERATIVE TAXPAYERS AND ARE IDENTIFIED AS "CONSTITUTIONALLY CHALLENGED". [sic]
- TP IS "CONSTITUTIONALLY CHALLENGED" OR WHATEVER WE ARE CALLING THEM NOWADAYS.
- SINCE TP [taxpayer] IS A TAX PROTESTOR DO NOT WANT TO GIVE [gender removed] APPEAL RIGHTS TWICE.

# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION

## There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005

**April 2006**

**Reference Number: 2006-10-070**

This report has cleared the Treasury Inspector General for Tax Administration (TIGTA) disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Phone Number** | **202-927-7037**
**Email Address** | **Bonnie.Heald@tigta.treas.gov**
**Web Site** | **http://www.tigta.gov**

April 21, 2006

**MEMORANDUM FOR** CHIEF HUMAN CAPITAL OFFICER
CHIEF COUNSEL

**FROM:** Michael R. Phillips /s/ Michael R. Phillips
Deputy Inspector General for Audit

**SUBJECT:** Final Audit Report – There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005 (Audit # 200610018)

This report presents the results of our review of violations of Fair Tax Collection Practices. The overall objective of this review was to obtain information on any Internal Revenue Service (IRS)

administrative or civil actions resulting from Fair Tax Collection Practices [1] violations by IRS employees. Section (§) 1102 (d)(1)(G) of the IRS Restructuring and Reform Act of 1998 [2] requires the Treasury Inspector General for Tax Administration to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to the violations of the fair debt collection provisions of 26 U.S.C. § 6304.

## Synopsis

Our review of 45 cases closed during the period January 1 through December 31, 2005, that were coded as Fair Debt Collection Practices Act (FDCPA) [3] violations, and an additional 169 employee misconduct cases that are similar in nature to FDCPA cases, identified 1 administrative action with respect to violations of Fair Tax Collection Practices. However, there were no civil actions that resulted in the IRS paying monetary settlements to taxpayers because of a Fair Tax Collection Practices violation.

## Response

We made no specific recommendations as a result of the analyses performed during this audit. However, IRS management reviewed a draft of this report and agreed with the facts and findings presented.

Copies of this report are being sent to the IRS managers affected by the report. Please contact me at (202) 622-6510 if you have questions or Dan Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

## Table of Contents

**Background**

**Results of Review**

There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices

No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers

**Appendices**

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Fair Tax Collection Practices Provisions

## Background

Section (§) 1102 (d)(1)(G) of the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) [4] requires the Treasury Inspector General for Tax Administration (TIGTA) to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to violations of the fair debt collection provisions of 26 U.S.C. § 6304, Fair Tax Collection Practices. [5] The IRS has traditionally referred to the 26 U.S.C. § 6304 violations as "Fair Debt Collection Practices Act" (FDCPA) [6] violations. The TIGTA Semiannual Report to Congress must provide a summary of such actions and include any judgments or awards granted.

The law itself does not provide an explanation of what is meant by "administrative actions." We used the IRS' definition when determining the number of FDCPA violations to be reported under RRA 98 § 1102 (d)(1)(G). The IRS' definition of administrative actions include disciplinary actions that range from admonishment to removal. Lesser actions, such as oral or written counseling, are not considered administrative actions.

As originally enacted, the FDCPA included provisions that restricted various collection abuses and harassment in the private sector. These restrictions did not apply to Federal Government practices. However, Congress believed that it was appropriate to require the IRS to comply with applicable portions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers (see Appendix IV for a detailed description of the FDCPA provisions). As such, RRA 98 § 3466(a) required the IRS to follow Fair Tax Collection Practices in line with the FDCPA.

Taxpayer complaints about IRS employees' conduct can be reported to several IRS functions for tracking on its management information systems. If a taxpayer files a civil action or if IRS management determines that the taxpayer's rights related to Fair Tax Collection Practices were

potentially violated, the complaint could be referred and then tracked on one or both of the following IRS systems:

- Office of Workforce Relations' Automated Labor and Employee Relations Tracking System (ALERTS), which generally tracks employee behavior that may warrant IRS management administrative actions.
- Office of Chief Counsel's Counsel Automated System Environment (CASE), which is an inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

The IRS began tracking FDCPA codes on the ALERTS in March 1999 and on the CASE in June 1999.

For the Calendar Year 2005 review, we analyzed closed cases from the ALERTS and the CASE to identify violations of Fair Tax Collection Practices. However, we could not ensure the cases recorded on the ALERTS and the CASE constitute all Fair Tax Collection Practices violations. Furthermore, the scope of our audit was not intended to determine the accuracy or consistency of disciplinary actions taken against employees for Fair Tax Collection Practices violations that were not reported to the Office of Workforce Relations.

This review was performed at the Chief Human Capital and Chief Counsel Offices in the IRS National Headquarters in Washington, D.C., during the period January to March 2006. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

# Results of Review

## There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices

There were 45 cases initially coded as FDCPA complaints closed on the ALERTS during the period January 1 through December 31, 2005.[7] However, only 14 of the 45 cases involved administrative actions being taken against employees. Of the 14 cases with administrative actions, none were a violation of the FDCPA; 12 cases were miscoded in the ALERTS, and the allegations related to the FDCPA were not substantiated for the other 2 cases. Most of the miscoded cases involved unprofessional conduct of employees.

Because of the high number of miscoded cases, we also reviewed 169 additional cases involving

employee misconduct allegations that are similar in nature to violations of Fair Tax Collection Practices and identified 1 case that was an FDCPA violation. The case involved an IRS employee using profane language in the presence of a taxpayer or taxpayer's representative while in the course of performing official duties. The case should have been coded as a violation of Fair Tax Collection Practices instead of unprofessional conduct of an employee. The employee left the IRS in lieu of removal.

Oral or written counseling is not considered an administrative action under the IRS' definition. Since the IRS does not routinely track all informal oral counseling or minor actions against its employees, it is not possible to determine how often, and for what reasons, informal oral counseling or other minor disciplinary actions occurred.

## *No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers*

Section 7433 of the Internal Revenue Code provides that a taxpayer may bring a civil action for damages against the Federal Government if an officer or employee of the IRS recklessly or intentionally, or by reason of negligence, disregards any provision of the Internal Revenue Code, or related regulation, in connection with the collection of Federal tax.

There were no cases closed on the CASE for which the IRS paid damages to taxpayers resulting from a civil action filed due to a Fair Tax Collection Practices violation.

**Appendix I**

# *Detailed Objective, Scope, and Methodology*

The overall objective of this audit was to obtain information on any Internal Revenue Service (IRS) administrative or civil actions resulting from Fair Tax Collection Practices (FTCP)[8] violations by IRS employees. Specifically, we:

I. Identified the number of FTCP violations resulting in administrative actions.

A. Obtained a computer extract from the Automated Labor and Employee Relations Tracking System (ALERTS)[9] of any cases opened after July 22, 1998, coded as Fair Debt Collection Practices Act[10] violations (Issue Codes 141 to 147), and closed during the period January 1 through December 31, 2005. We analyzed the ALERTS extract and obtained additional case file information from the Labor

Relations function, if needed, to determine the type of violation.

B. Determined if any cases involving FTCP violations resulted in administrative actions.

C. Obtained a computer extract from the ALERTS of any cases opened after July 22, 1998, with the following Issue Codes:

- 058 (Unprofessional Conduct - limited to only those closed with a disposition code of 009 or higher).
- 114 (Conviction Assault/Battery - all disposition codes).
- 119 (Threat of Audit/Personal - all disposition codes).
- 999 (Not Otherwise Coded - limited to only those closed with a disposition code of 009 or higher) and closed during the period January 1 through December 31, 2005.

Note: We did not attempt to independently validate the accuracy of the complete ALERTS database for this review. We limited our work to only assess the accuracy of the Issue Codes for those cases which met our criteria as listed in steps I.A through I.C.

II. Identified the number of FTCP violations resulting in IRS civil actions (judgments or awards granted) by obtaining a computer extract from the Counsel Automated System Environment [11] database of any Subcategory 6304 (established to track FTCP violations) cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005. The Office of Chief Counsel identified no cases.

**Appendix II**

## Major Contributors to This Report

Daniel R. Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)
Carl L. Aley, Acting Director
Kevin P. Riley, Audit Manager
Tom J. Cypert, Lead Auditor
Frank I. Maletta, Auditor
William E. Thompson, Auditor

Appendix III

## Report Distribution List

Commissioner C
Office of the Commissioner – Attn: Chief of Chief C
Deputy Commissioner for Operations Support OS
Director, Workforce Relations OS:HC:R
National Taxpayer Advocate TA
Director, Office of Legislative Affairs CL:LA
Director, Office of Program Evaluation and Risk Analysis RAS:O
Office of Management Controls OS:CFO:AR:M
Audit Liaisons: Chief Counsel CC
Chief Human Capital Officer OS:HC

Appendix IV

## Fair Tax Collection Practices Provisions

To ensure equitable treatment among debt collectors in the public and private sectors, the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 [12] requires the IRS to comply with certain provisions of the Fair Debt Collection Practices Act. [13] Specifically, the IRS may not communicate with taxpayers in connection with the collection of any unpaid tax:

- At unusual or inconvenient times.
- If the IRS knows that the taxpayer has obtained representation from a person authorized to practice before the IRS, and the IRS knows or can easily obtain the representative's name and address.
- At the taxpayer's place of employment, if the IRS knows or has reason to know that such communication is prohibited.

Further, the IRS may not harass, oppress, or abuse any person in connection with any tax collection activity or engage in any activity that would naturally lead to harassment, oppression, or abuse. Such conduct specifically includes, but is not limited to:

- Use or threat of violence or harm.

- Use of obscene or profane language.

- Causing a telephone to ring continuously with harassing intent.

- Placement of telephone calls without meaningful disclosure of the caller's identity.

---

[1]
   26 U.S.C. § 6304 (2004).
[2]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[3]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).  The IRS has traditionally referred to the Fair Tax Collection Practices violations under 26 U.S.C. § 6304 as "Fair Debt Collection Practices Act" violations.
[4]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[5]
   26 U.S.C. § 6304 (2004).
[6]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).
[7]
   This included cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005.
[8]
   26 U.S.C. § 6304 (2004).
[9]
   The Office of Workforce Relations' ALERTS generally tracks employee behavior that may warrant IRS management administrative actions.
[10]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).
[11]
   The Counsel Automated System Environment is an Office of Chief Counsel inventory control system that tracks items such as taxpayer civil actions or bankruptcies.
[12]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[13]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).